2019 IL App (1st) 110580-B

FOURTH DIVISION
May 16, 2019
Modified Upon Denial of Rehearing June 27, 2019

No. 1-11-0580

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 26477 |
| | ) | |
| ANTONIO HOUSE, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion. Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Our initial opinion in this case was filed December 24, 2015. Subsequently, both parties filed petitions for rehearing, which this court denied. The parties then filed respective petitions for leave to appeal in the Illinois Supreme Court in 2017. On November 28, 2018, the Illinois Supreme Court denied the petitions for leave to appeal from both the State and defendant Antonio House. However, on the petition for leave to appeal filed by the State, the supreme court issued a supervisory order directing this court to vacate our opinion and "to consider the effect of [the supreme] court's opinion in *People v. Harris*, 2018 IL 121932, on the issue of whether defendant's sentence violates the Proportionate Penalties Clause of the Illinois Constitution." *People v. House*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order).

¶ 2    In addressing the supervisory order, defendant filed a motion to file additional briefing, which this court allowed. In lieu of filing the additional briefs, the parties later filed an agreed motion for summary disposition asking this court to remand defendant's case for further second-

stage postconviction proceedings. We deny the motion and explain the basis for the denial later in this opinion.

¶ 3 Because the supreme court's supervisory order is limited to the discrete issue of defendant's proportionate penalties claim, we do not address the other issues initially raised by defendant on appeal. See *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2012 IL App (2d) 100024, ¶ 32 (where a matter is remanded by a court of review to a lower court with directions to enter a certain order or decree, the latter court has no discretion but to enter the decree as directed). This court upheld the second stage dismissal of defendant's additional claims, and the supreme court denied leave to appeal as to those claims. Thus, those claims have been fully adjudicated, and the dismissal is final. Accordingly, we review only those facts relevant to the singular issue raised on appeal.

¶ 4 Following a jury trial, defendant was found guilty of two counts of first degree murder and two counts of aggravated kidnapping in the September 1993 deaths of Stanton Burch and Michael Purham. The trial court subsequently sentenced defendant to two consecutive life sentences for the murder convictions and two terms of 30 years for the aggravating kidnapping convictions to run consecutive to the life sentences.

¶ 5 We previously described the general circumstances of this case as follows:

"The facts of this case arise out of an intra-gang conflict regarding the right to sell drugs on a street corner. In 1993, there was a split in the Unknown Vice Lords (UVL) street gang. The two warring factions were led by Tyrone 'Baby Tye' Williams and Willie Lloyd. Artez 'Ted' Thigpen, a UVL member who remained loyal to Williams, controlled drug sales at the corner of Springfield

Avenue and Fillmore Street in Chicago, Illinois. The victims in this case, Stanton Burch and Michael Purham, were UVL members who were loyal to Lloyd. The day before the victim[s'] deaths, Lloyd and some of his men went to the corner, where they beat up and robbed one of Thigpen's drug sellers. The following day, Burch and Purham were dropped off at the corner, where they announced to Thigpen's drug sellers that the corner now belonged to Lloyd. Burch and Purham then began to sell drugs. Soon thereafter, Thigpen and an armed group of his men arrived at the corner. Defendant allegedly was a member of this group. The group forced Burch and Purham into a car at gun point. Burch and Purham were then taken to a vacant field where they were shot and killed. Defendant was arrested on October 27, 1993, and on the following day gave a handwritten statement regarding his involvement in the kidnapping and murder of the victims." *People v. House*, 377 Ill. App. 3d 1141 (2007) (table) (unpublished order under Supreme Court Rule 23).

¶ 6    At trial, the State presented the testimony of Eunice Clark and her boyfriend Barry "Smurf" Williams (Barry). Clark admitted that at the time of trial, she was serving an 11-year sentence for two attempted murder convictions. Clark testified that in September 1993, she was 16 years old and a member of the Traveling Vice Lords gang. At around 10 a.m. on September 12, 1993, Clark was at the corner of South Springfield Avenue and West Fillmore Street in Chicago. She was at that location to sell drugs for Thigpen and Williams with several other drug

3

dealers, including Barry. That day, Clark saw Lloyd and his bodyguards call over one of the drug dealers, "Larry." Lloyd and his bodyguards beat up Larry and took Larry's drugs and money.

¶ 7     The next day, on September 13, 1993, Clark was on the same corner with other dealers waiting to sell drugs. Lloyd then drove up and dropped off Burch and Purham. Burch and Purham began selling drugs. Later, Thigpen and Williams drove by the corner. They returned a short time later with two additional men in the vehicle. Clark testified that several other men ran over from nearby railroad tracks. She testified that all of the men were armed with a handgun. Clark identified defendant as one of those men. Thigpen and the men surrounded Burch and Purham and forced them into Thigpen's vehicle at gunpoint. Clark heard a loud noise inside the car but was not positive if it was a gunshot.

¶ 8     Clark testified that Thigpen told her that if anyone asked where Burch and Purham were that she was to say that the police picked them up. Thigpen entered his vehicle and drove off. The rest of the men returned to the area near the railroad tracks on foot. Later that day, Clark told Burch's girlfriend what happened. That evening, Clark was approached by Burch's mother and the police. Clark was taken to the Area 4 police station and spoke with detectives. She returned and gave a signed statement on September 16, 1993.

¶ 9     Clark also testified that on October 12, 1993, she was walking near 18th Street and St. Louis Avenue when she saw defendant and another individual in a gray vehicle. They pulled the car over and asked Clark to get into the car. Clark refused, and the men tried to force her into the vehicle with one man striking her in the back of the neck. When the men let go, defendant told her that he did not want her to testify. Clark said she told them that she had to testify.

¶ 10    Clark admitted that she received a total of $1200 in relocation expenses from the State, but she used the majority of the money on clothes and personal items.

¶ 11    Barry testified at trial that he also went by the name Aaron Lamar. At the time of trial, he was serving a six-year sentence for a narcotics conviction. In September 1993, he was 23 years old and was in a relationship with Clark. Barry was a member of the UVL gang. Barry was unable to recall most of his prior statements and testimony, but his handwritten statement and grand jury testimony were introduced at trial. His prior statements corroborate Clark's testimony regarding the events of September 13, 1993, including defendant's involvement.

¶ 12    Barry testified that on the morning of September 13, 1993, he was waiting for Thigpen to bring drugs for him to sell on the corner of Springfield Avenue and Fillmore Street with Clark and two other individuals. Another car approached the intersection and two men exited the vehicle. He did not recognize these individuals. According to Barry, the men said that location was no longer Thigpen's and now belonged to Lloyd. The two men then proceeded to sell drugs at that location. Thigpen drove by the location and then returned approximately 10 minutes later with two men in the vehicle. Several other men approached the intersection at that time, including defendant. The men were armed with handguns. They surrounded the two men selling drugs and forced them into Thigpen's vehicle. Thigpen drove away, and the other men returned the way they came.

¶ 13    Assistant State's Attorney (ASA) Solita Pandit testified at trial that she took defendant's handwritten statement on October 28, 1993. The statement was offered into evidence which the trial court admitted and published the statement to the jury. Defendant stated that he was a member of the UVL gang. He worked for Thigpen selling drugs at the corner of Springfield Avenue and Fillmore Street. Defendant said that Lloyd was formerly the "head boss" of the UVL, but there was fighting regarding that position. He had heard that one of Thigpen's workers had been robbed by Lloyd and his men on September 12, 1993. On September 13, 1993,

defendant was on Springfield Avenue between Arthington Street and Fillmore Street when he saw Clark. Clark told defendant that Lloyd had dropped off two of his workers at the spot and the police had picked them up. Clark then said that Thigpen told her to say this but that Thigpen "had got them, put them into his car and drove them away." Defendant then saw Fred Weatherspoon and another UVL member. Weatherspoon told defendant to get his car and pick them up because they needed to go meet Thigpen at the railroad tracks at California Avenue and Roosevelt Road. Weatherspoon told defendant that Thigpen had two of Lloyd's men and they were going to be "violated," meaning "physically punished, ranging from being hit with hands, boards or being shot." Defendant drove them to where Thigpen was with Lloyd's men.

¶ 14    At that location, defendant saw another UVL member, Derrick Harvey. He said two vehicles were parked with the hoods up to appear as though a car battery needed to be jumped. Harvey said he was acting as a lookout for the police for Thigpen, who was violating Lloyd's men by the railroad tracks. Defendant parked his car and also acted as a lookout. He heard approximately eight gunshots from the railroad tracks and then observed several UVL members. He was told by Williams that "they got Willie's boys," which defendant knew meant the men had been killed.

¶ 15    Defendant stated that he had a gun when he was arrested, but it was not the gun used in the shootings. He also said he received a phone call from Williams in jail on October 11, 1993. Williams told defendant to tell Clark not to come to court to testify against him. The next day, defendant saw Clark and told her not to testify.

¶ 16    Defendant stated that he was treated well by the police and that he was not made any promises for his statement nor was he threatened in any way.

¶ 17    Defendant testified at trial on his own behalf. He stated that he was a member of the UVL and he was 19 years old on September 13, 1993. On that date, he drove to the vicinity of Springfield Avenue and Fillmore Street to sell drugs for Thigpen. He observed Clark, Barry, and other people in the area. Defendant testified he asked Clark where everyone was, meaning the people who issued the drugs to the sellers. Clark initially told him that the police came and everyone was gone. Shortly thereafter, Clark said that Thigpen, Weatherspoon, and others took someone to be violated. Defendant then walked to the corner and saw Weatherspoon and another person. They told defendant that two men had been violated and needed a ride. Defendant drove the two men west on Roosevelt Road until Weatherspoon told him to pull over near Campbell Avenue. Two cars were parked under the railroad tracks viaduct with their hoods up. He recognized other UVL members, including Harvey. He dropped off Weatherspoon and the other man, then he made a U-turn and left that location. As he was leaving, he heard approximately eight gunshots and observed several people coming from the railroad tracks.

¶ 18    Defendant then testified he was brought into a room where ASA Pandit was already sitting. He stated that ASA Pandit did not write the statement in his presence, but he admitted that he signed it. He denied reading the statement before signing it. Defendant said that he believed that he would be a witness for the State against Thigpen and Williams. He denied that he acted as a lookout near the railroad tracks or that he was present when the men were forced into Thigpen's car. He denied that he was treated well by the police and that Detective Chambers brought him food.

¶ 19    Following deliberations, the jury found defendant guilty of two counts of first degree murder and two counts of aggravated kidnapping. The trial court subsequently sentenced

defendant to two consecutive life sentences for the murder convictions and received two consecutive 60-year sentences for the aggravated kidnapping convictions.[1]

¶ 20    On direct appeal, defendant raised several issues, including the argument that defendant's consecutive and extended term sentences violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Another panel of this court affirmed defendant's convictions, vacated his aggravated kidnapping sentences, and remanded the matter for resentencing. *People v. House*, No. 1-98-4324 (2001) (unpublished order under Illinois Supreme Court Rule 23).[2]

¶ 21    While his direct appeal was pending, defendant filed his *pro se* petition for postconviction relief in September 2001, alleging that (1) he was denied a fair trial through the knowing use of perjured testimony and fabricated evidence by the police officers and ASAs, (2) Clark's initial testimony before the grand jury only named Thigpen and Weatherspoon as being involved in the kidnapping of Burch and Purham, and (3) Clark has recanted her trial testimony identifying defendant as participating in the kidnapping. In December 2001, the trial court dismissed defendant's postconviction petition, finding that it lacked jurisdiction while defendant's direct appeal remained pending.

¶ 22    Defendant appealed the dismissal. In January 2003, the State filed a confession of error in the appeal. The State "concluded that error was committed in the circuit court because the Post-Conviction Hearing Act does not bar a circuit court from considering a post-conviction petition while a direct appeal of the defendant's criminal conviction is pending." The State asked that the trial court's order be reversed and remanded to the trial court with directions to proceed to the second stage of the postconviction process. The reviewing court allowed the State's confession

---

[1] Defendant originally received consecutive 60-year sentences for the aggravated kidnapping convictions, which was reduced to consecutive 30-year terms on remand.
[2] This Rule 23 order was subsequently vacated and withdrawn pursuant to a supervisory order from the Illinois Supreme Court.

of error in February 2003, vacated the dismissal, and remanded the case for second stage review under the postconviction process.

¶ 23    Upon remand, defendant's postconviction petition was assigned to an assistant public defender for further review. In April 2010, defendant, through his attorney, filed his amended postconviction petition. The amended petition raised 15 issues in 43 pages, with approximately 300 pages of exhibits. The petition raised numerous claims of ineffective assistance of trial and appellate counsel, claims of a denial of due process, newly discovered evidence of actual innocence based on Clark's affidavit, newly discovered evidence of police misconduct, and the imposition of a mandatory life sentence as applied in defendant's case was unconstitutional. The State filed a motion to dismiss defendant's amended postconviction petition, arguing that everything raised in the petition was either raised on direct appeal or could have been raised on direct appeal. The State asserted that defendant attempted to bypass waiver and *res judicata* by alleging ineffective assistance of appellate counsel or newly discovered evidence, but defendant could not establish ineffectiveness under *Strickland v. Washington*, 466 U.S. 668 (1984), nor did the alleged newly discovered evidence satisfy the requirements of *People v. Washington*, 171 Ill. 2d 475 (1996). In February 2011, the trial court granted the State's motion and dismissed defendant's amended postconviction petition.

¶ 24    This appeal followed.

¶ 25    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 to 122-8 (West 2008)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *Id.* § 122-1(a)(1); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at

the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 26    Defendant raised five issues on appeal: (1) actual innocence based on Clark's recantation of her trial testimony; (2) he made a substantial showing that his constitutional rights were violated based on newly discovered evidence related to police misconduct, including abuse, intimidation, and a coerced confession; (3) the trial court erred in denying his postconviction counsel's request to obtain Office of Professional Standards files on the detectives involved in his interrogation; (4) he made a substantial showing of ineffective assistance of trial and appellate counsel; and (5) his mandatory sentence of natural life violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art.I, § 11). As previously observed, the first four issues have been fully adjudicated and their dismissal was proper. As a result, we will not consider those issues and turn only to the final issue and the basis for the supervisory order from the Illinois Supreme Court.

¶ 27    The supreme court's supervisory order directed this court to reconsider defendant's proportionate penalties challenge in light of the recent decision of *People v. Harris*, 2018 IL 121932. Prior to the supervisory order entered in this appeal, defendant argued that his mandatory natural life sentence violated the proportionate penalties clause of the Illinois Constitution because the sentence is mandated for all offenders convicted of murder of more than

one decedent without consideration of age or level of culpability. Defendant also asserted that the sentence is invalid as applied to him because of his age and minimal involvement in the commission of the crimes. The State countered that defendant's mandatory natural life sentence was constitutional, both facially and as applied. In our original opinion, we concluded defendant's sentence of mandatory natural life violated the proportionate penalties clause as applied to him.

¶ 28    Defendant based his constitutional challenge on several recent United States Supreme Court decisions. See *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012).

> "In *Roper*, the Supreme Court held that the eighth amendment prohibits the death penalty for juvenile offenders. *Roper*, 543 U.S. at 568. The Court reasoned that the 'death penalty is reserved for a narrow category of crimes and offenders,' and that 'juvenile offenders cannot with reliability be classified among the worst offenders.' *Id.* at 569. In *Graham*, the Supreme Court held that the eighth amendment forbids a sentence of life without the possibility of parole for juveniles who did not commit homicide. *Graham*, 560 U.S. at 74 \*\*\*. The Court said that, although the state is not required to release a juvenile during his natural life, the state is forbidden 'from making the judgment at the outset that those offenders never will be fit to reenter society.' *Id.* at 75 \*\*\*. \*\*\* In *Miller*, the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without

11

the possibility of parole for juvenile offenders, including those convicted of homicide. *Miller*, 567 U.S. at [479] ***. The Court stated that a judge must have the opportunity to look at all of the circumstances involved before determining that life without the possibility of parole is the appropriate penalty. See *id.* ***."

*People v. Harmon*, 2013 IL App (2d) 120439, ¶ 48.

¶ 29    Because defendant acted as a lookout during the commission of the murders, he was found guilty under a theory of accountability, which mandates that all participants of a common design are considered equally responsible. See 720 ILCS 5/5-2(c) (West 1998). Defendant was sentenced to mandatory natural life under section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). At the time of defendant's sentencing, section 5-8-1(a)(1)(c)(ii) mandated a term of natural life for all persons, regardless of their age at the time of the commission of the murder, who were found guilty of murdering more than one victim. *Id.*[3]

¶ 30    In *Harris*, the Illinois Supreme Court considered a defendant's claim that the mandatory minimum sentence of 76 years for first degree murder, attempted murder, and aggravated battery committed when he was 18 years old violated the proportionate penalties clause of the Illinois Constitution. *Harris*, 2018 IL 121932, ¶ 1. There, the defendant was found guilty as the perpetrator in the shooting death of one victim and the attempted murder of a second gunshot victim at a Chicago gas station. *Id.* ¶¶ 1, 3. The defendant raised his proportionate penalties challenge for the first time in his direct appeal. The reviewing court vacated the defendant's sentences, holding that " '[w]hile we do not minimize the seriousness of [defendant's] crimes,

---

[3] Public Act 99-69 amended section 5-8-1(a)(1)(c)(ii) to provide for a mandatory life sentence for a person who has attained the age of 18 and was found guilty of murdering more than one victim. Pub. Act 99-69 § 10 (eff. Jan. 1, 2016) (amending 730 ILCS 5/5-8-1(a)(1)(c)(ii)).

we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society.' " *Id.* ¶ 18 (quoting *People v. Harris*, 2016 IL App (1st) 141744, ¶ 69).

¶ 31    On appeal, the supreme court reversed that finding, holding that because the defendant did not raise his as-applied constitutional challenge in the trial court, the trial court did not hold an evidentiary hearing or make any findings of fact on his specific circumstances. *Id.* ¶¶ 40, 63. The court concluded that the defendant's challenge was premature. *Id.* ¶ 46. The court observed that the United States Supreme Court's holding in *Miller* did not apply directly to his circumstances because he was 18 years old at the time of the offense. *Id.* ¶ 45. The supreme court rejected the defendant's contention that the record on appeal contained sufficient information about how the evolving science on juvenile and brain development applied to him. *Id.* ¶ 46. Rather, the court observed that the record on appeal included only basic information about him, mostly from the presentence investigation report. *Id.* "An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult." *Id.* The supreme court found that the record on appeal did not contain evidence "about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." *Id.* The court did not consider the merits of the defendant's challenge and concluded that his claim was more appropriate for another proceeding, such as a postconviction proceeding or raised in a petition seeking relief from a final judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48.

¶ 32    After considering the supreme court's decision in *Harris*, we again conclude defendant is entitled to a new sentencing hearing. Significantly, the defendant in *Harris* was the actual

shooter, unlike defendant in the present case who was convicted under an accountability theory. As discussed throughout our previous analysis, defendant's conviction under the theory of accountability weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community. We also note that the supreme court in *Harris* considered that the defendant had raised his proportionate penalties challenge for the first time on appeal and observed that his challenge was premature and more appropriately raised in postconviction proceedings. See *id.* Here, defendant has consistently challenged his mandatory natural life sentence in both his direct appeal and his present postconviction petition. At defendant's original sentencing hearing, immediately after the trial court imposed defendant's sentence, defense counsel filed a motion to reconsider defendant's mandatory life sentence as unconstitutional. His claim is before us in the forum suggested by the supreme court in *Harris*. Accordingly, we do not believe defendant's challenge is premature, as it was in *Harris*.

¶ 33    We turn to defendant's contention that his sentence is unconstitutional as applied to his case. Defendant points out that he had just turned 19 years old at the time of commission of the murders, was minimally culpable, and had no prior violent criminal history, but he received a mandatory natural life sentence without the consideration of these mitigating factors.

¶ 34    According to eyewitnesses, defendant was present when the victims were surrounded and forced into a vehicle at gunpoint. The eyewitnesses also testified that defendant was armed at this time. In his statement to ASA Pandit, defendant admitted that he acted as a lookout when the victims were shot. Defendant's role made him accountable for the murders and cannot be discounted.

¶ 35    However, we find it significant to note the following. The evidence against defendant's codefendants and the sentences that were imposed in their cases shows the following.[4] At Weatherspoon's trial, as at defendant's trial, Clark and Barry testified about the factions within the UVL gang over selling drugs at the corner of Springfield Avenue and Fillmore Street. *People v. Weatherspoon*, 327 Ill. App. 3d 1126 (2002) (table) (unpublished order under Supreme Court Rule 23). On the day of crimes, Clark observed Weatherspoon with Thigpen in Thigpen's vehicle. Clark identified Weatherspoon as one of the men who surrounded the victims and forced them into the vehicle. Clark testified that Weatherspoon pointed a gun at the victims and either fired the gun at the victims or struck them with the gun. *Weatherspoon*, slip order at 3-4. Weatherspoon gave a statement admitting to being present during the kidnapping and possessing a gun. Weatherspoon acted as lookout for police during the homicides. *Id.* at 9-10.

¶ 36    At the time of the offenses in September 1993, Weatherspoon was 17 years old. Weatherspoon initially received a natural life sentence. *Id.* at 1. We take judicial notice of the circuit court docket sheet from Weatherspoon's case. See *People v. Davis*, 65 Ill. 2d 157, 164-65 (1976) (a reviewing court may take judicial notice of public records and other judicial proceedings). According to the docket sheet, Weatherspoon was resentenced in December 2016 to a total term of 44 years. Under the sentencing laws in place at the time of the offenses, Weatherspoon was eligible to receive day-for-day good conduct credit on his sentence and was released from prison to begin serving his term of mandatory supervised release in 2018. See 730 ILCS 5/3-6-3(a)(2) (West 1992). According to the Illinois Department of Corrections website, Fred Weatherspoon was released from incarceration on April 13, 2018, and is projected to be discharged from mandatory supervised release on April 13, 2021. See Ill. Dept. of Corrections,

---

[4] We note that Artez Thigpen, the apparent shooter in this crime, was convicted of the unrelated first degree murder of Clifton Burks, which occurred on September 12, 1993, and he was sentenced to a term of 75 years in prison. See *People v. Thigpen*, 306 Ill. App. 3d 29 (1999).

Offender Search, https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited May 9, 2019) (search by offender's last name). This court may take judicial notice of the public records of the Illinois Department of Corrections. *People v. Sanchez*, 404 Ill. App. 3d 15, 17 (2010).

¶ 37 Hulon Verser was also prosecuted for his participation in the kidnapping and murders of Burch and Purham. *People v. Verser*, 328 Ill. App. 3d 1093 (2002) (table) (unpublished order under Supreme Court Rule 23). At Verser's jury trial, an ASA testified that Verser gave a statement that was handwritten by the ASA and Verser signed it. In the statement, Verser admitted to being a member of the UVL and that he sold drugs for Thigpen at the location in dispute. After a man selling drugs for Thigpen was robbed by Lloyd, Verser was instructed by Thigpen to get a gun. Verser then accompanied Thigpen and other men to look for Lloyd and his followers. Verser stated that Thigpen had promised Verser his own spot to sell drugs if he helped defend that location. The next day, Verser ran over to the location when two of Lloyd's men began selling drugs. When he arrived, the men were already in the car. The men were taken to a spot between the railroad tracks on Roosevelt Street. Verser stated that Thigpen shot one of the men in the head and then he and the other men present began shooting at the other victim. *Verser*, slip order at 6-8.

¶ 38 Barry also testified at Verser's trial, but he testified that he did not remember Verser being present at the scene. Barry's prior statement to the ASA and his grand jury testimony were introduced at the time. In his prior statements, Barry stated that Verser was among the group that came to the corner with Thigpen when the victims were kidnapped. *Id.* at 8. At the time of his arrest, Verser possessed a 9-millimeter handgun. A stipulation from a firearm expert was

admitted in which the expert would state that the 9-millimeter handgun found on Verser could have fired the 9-millimeter bullet recovered from Burch's clothing. *Id.* at 9-10.

¶ 39     Verser testified that he was friends with Thigpen and a member of the UVL. *Id.* at 10. He denied giving a statement to police or the ASA but admitted to signing and initialing the statement prepared by the ASA. He testified that he signed the statement because the ASA told him he could leave if he signed it. *Id.* at 11.

¶ 40     Following the trial, the jury found Verser guilty of two counts of first degree murder and two counts of aggravated kidnapping. He was sentenced to a term of natural life for the murder convictions. *Id.* at 12.

¶ 41     The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A defendant can raise a proportionate penalties challenge on the basis that the penalty for a particular offense is too severe under the 'cruel or degrading' standard or that the penalty is harsher than the penalty for a different offense that contains identical elements." *People v. Williams*, 2015 IL 117470, ¶ 9 (citing *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005)).

¶ 42     "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). "With regard to the statute at issue, we have recognized that the legislature considered the possible rehabilitation of an offender who commits multiple murder[s], and the

seriousness of that offense, in determining that a mandatory minimum sentence of natural life imprisonment is appropriate for the offense of multiple murders." *Id.*

¶ 43    In *Leon Miller*, the supreme court considered whether a mandatory sentence of natural life violated the proportionate penalties clause when applied to a juvenile found guilty under an accountability theory. *Id.* at 337. The *Leon Miller* court reviewed the question under the first theory, whether the sentence shocked the moral sense of the community. *Id.* at 338-39. The court noted that the sentence was imposed based on the convergence of three statutes, the automatic transfer of juveniles 15 or 16 years old charged with murder to criminal court (705 ILCS 405/5-4(6)(a) (West 1996)), the accountability statute (720 ILCS 5/5-2(c) (West 1996)), and the mandatory natural life sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)). *Leon Miller*, 202 Ill. 2d at 340.

¶ 44    The *Leon Miller* court held that the defendant's sentence was unconstitutional as applied to him.

> "Accordingly, we hold that the penalty mandated by the multiple-murder sentencing statute as applied to this defendant is particularly harsh and unconstitutionally disproportionate. We agree with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during

18

the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole—the same sentence applicable to the actual shooter. Our decision does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate. It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Id.* at 341.

¶ 45    The supreme court further reasoned:

"However, the convergence of the Illinois transfer statute, the accountability statute, and the multiple-murder sentencing statute eliminates the court's ability to consider any mitigating factors such as age or degree of participation. A life sentence without the possibility of parole implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life. The trial judge in this case did not agree with such a blanket proposition. We also decline to find that the sentence mandated by the multiple-murder sentencing statute in this case satisfies the proportionate penalties clause of the Illinois Constitution." *Id.* at 342-43.

¶ 46    While defendant was not a juvenile at the time of the offense, his young age of 19 is relevant under the circumstances of this case. As in *Leon Miller*, defendant's sentence involved the convergence of the accountability statute and the mandatory natural life sentence. We acknowledge that the offender in *Leon Miller* was 15, never handled a firearm, and had less than a minute to consider the implications of his participation. In the present case, the State's evidence at trial established that defendant was not present at the scene of the murder but merely acted as a lookout near the railroad tracks. There was no evidence that defendant helped to plan the commission but instead took orders from higher ranking UVL members. While defendant had a greater involvement in the commission of the offenses than the defendant in *Leon Miller*, after considering the evidence and defendant's relevant culpability, we question the propriety of a mandatory natural life sentence for a 19-year-old defendant convicted under a theory of accountability. Although defendant acted as a lookout during the commission of the crime and was not the actual shooter, he received a mandatory natural life sentence, the same sentence applicable to the person who pulled the trigger. Defendant is serving the same mandatory sentence of natural life as Verser, a codefendant who participated in the shooting of the victims, while Weatherspoon, a codefendant with the similar culpability as defendant has been released from the penitentiary following resentencing because Weatherspoon was 17 years old during the commission of the murders.

¶ 47    We also observe that the Supreme Court in *Miller*, *Graham*, and *Roper* considered the continuing brain development in adolescents.

> "Because juveniles have diminished culpability and greater
> prospects for reform, we explained, 'they are less deserving of the
> most severe punishments.' *Graham*, 560 U.S., at 68. Those cases

20

relied on three significant gaps between juveniles and adults. First, children have a ' "lack of maturity and an underdeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569. Second, children 'are more vulnerable ... to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid*. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' *Id.*, at 570.

Our decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well. *Id.*, at 569. In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." ' *Id.*, at 570 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' 560

21

U.S., at 68. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' *Ibid.* (quoting *Roper*, 543 U.S., at 570)." *Miller*, 567 U.S. at 471-72.

¶ 48 As the *Graham* Court noted, "[e]ven if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered." *Graham*, 560 U.S. at 72. The *Roper* Court stated, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573 (citing Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014-16 (2003)).

¶ 49 "It is widely recognized by many legal scholars that the United States Supreme Court is moving rather quickly towards abolishing life without parole sentences for juvenile offenders entirely." Maureen Dowling, Note, *Juvenile Sentencing in Illinois: Addressing the Supreme Court Trend Away From Harsh Punishments for Juvenile Offenders*, 35 N. Ill. U. L. Rev. 611, 619 (2015).

"There are several parts of the analyses of each case that point to this inevitable shift. First, each case acknowledges that the decisions are directly contrary to our historical understanding of juvenile sentencing. The Court rejects the notion of looking at

sentencing 'through a historical prism' in favor of the evolving moral and ethical standards of society. This opens up the Court to abolish life without parole sentences for juveniles, even though traditionally it is a widely practiced and accepted sentence. Second, each opinion makes it clear that simply because a majority of state sentencing statutes do not currently agree with the decisions, this will not affect the outcome. This argument goes hand-in-hand with the Court's rejection of historical sentencing standards. Again, the Court has left open the possibility of abolishing the harshest sentence available to juveniles. Finally, the Court repeatedly emphasizes the differences between juveniles and adults as an explanation for why each should be sentenced differently. The continued focus on these differences further bolsters the argument for abolishing life sentences without the possibility of parole for juveniles." *Id.* at 619-20.

¶ 50    "The Supreme Court has followed a clear path away from life without parole sentences. Following the reasoning laid out by the Court in these three cases, it can easily be seen how the Court would deal with abolishing the sentence entirely." *Id.* at 627. As this note observes, several states have responded to *Miller* by imposing "*de facto*" life sentences through lengthy term-of-years sentences. *Id.* at 620. However,

"These de-facto life sentences are not consistent with the language or analysis found in both *Miller* and *Graham*. A prison sentence that will last sixty or more years does not allow courts to show juvenile offenders any clemency.

23

Furthermore, despite the lengthy discussion about the differences between adults and juveniles, de-facto life sentences do not give courts any opportunity to take the differences into account when determining a sentence." *Id.* at 621.

The question of considering *Miller* when a juvenile receives a long prison term, in essence a *de facto* life sentence, has been reviewed recently by the Illinois Supreme Court.

¶ 51    In *People v. Buffer*, 2019 IL 122327, the Illinois Supreme Court considered what term of years imposed on a juvenile defendant constitutes a *de facto* natural life sentence. There, the juvenile defendant received a 50-year sentence for a first degree murder committed when he was 16 years old. *Id.* ¶ 1. In his postconviction petition, the defendant argued that the sentence was unconstitutional as applied to him. The circuit court summarily dismissed the petition as frivolous and patently without merit. *Id.* ¶ 7. The appellate court reversed the dismissal and found that the 50-year sentence was a mandatory *de facto* natural life sentence and the circuit court failed to consider the defendant's youth and its attendant characteristics in imposing the sentence. The reviewing court remanded the case for resentencing. *Id.* ¶ 9.

¶ 52    The Illinois Supreme Court reviewed the United States Supreme Court jurisprudence related to minors, including *Miller*. The supreme court held that for a defendant to succeed on a *Miller* claim for an offense committed while a juvenile, the defendant must show "(1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27.

¶ 53    The *Buffer* court then turned to the question of what specific term of years amounts to a *de facto* natural life sentence. *Id.* ¶ 29. After reviewing recent enactments by the General Assembly, the supreme court concluded that a prison term of 40 years is long enough to be

considered a *de facto* natural life sentence. *Id.* ¶ 40. Based on this conclusion, the court found that the defendant's 50-year sentence was a *de facto* natural life sentence and remanded for a new sentencing hearing. *Id.* ¶¶ 42, 44. The supreme court held that in the interests of judicial economy and the issue on appeal, the proper remedy was a new sentencing hearing. *Id.* ¶ 47. In remanding for a sentencing hearing, the supreme court determined that the record did not "require factual development." *Id.* ¶ 46. "All of the facts and circumstances to decide defendant's claim are already in the record." *Id.* The supreme court observed that the record did not indicate that the circuit court considered the defendant's youth and its attendant characteristics in imposing the sentence. *Id.*

¶ 54    Although the Court in *Roper* delineated the division between juvenile and adult at 18, we do not believe that this demarcation has created a bright line rule. See *Roper*, 543 U.S. at 574 ("Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.").

¶ 55    Rather, as we found in our earlier opinion, the designation that after age 18 an individual is a mature adult appears to be somewhat arbitrary, especially in the case at bar. Recent research and articles have discussed the differences between young adults, like defendant, and a fully mature adult. "Research in neurobiology and developmental psychology has shown that the brain doesn't finish developing until the mid-20s, far later than was previously thought. Young adults

are more similar to adolescents than fully mature adults in important ways. They are more susceptible to peer pressure, less future-oriented and more volatile in emotionally charged settings." Vincent Schiraldi & Bruce Western, *Why 21 Year-Old Offenders Should be Tried in Family Court*, Wash. Post (Oct. 2, 2015), www.washingtonpost.com/opinions/time-to-raise-the-juvenile-age-limit/2015/10/02/948e317c-6862-11e5-9ef3-fde182507eac_story.html [https://perma.cc/FV36-XURC].

> "The young adult brain is still developing, and young adults are in transition from adolescence to adulthood. Further, the ongoing development of their brains means they have a high capacity for reform and rehabilitation. Young adults are, neurologically and developmentally, closer to adolescents than they are to adults. Prosecuting and sentencing young adults in the adult criminal justice system deprives them of their chance to become productive members of society, leads to high recidivism rates, and high jail and prison populations, and increased costs to society through subsequent incarceration and unemployment." Kanako Ishida, *Young Adults in Conflict with the Law: Opportunities for Diversion*, Juvenile Justice Initiative, at 1 (Feb. 2015), https://jjustice.org/wp-content/uploads/Young-Adults-in-Conflict-with-the-Law-Opportunities-for-Diversion.pdf [https://perma.cc/69CY-SGF9].

¶ 56    These articles illustrate the need to expand juvenile sentencing provisions for young adult offenders. Both articles noted that several European countries have already extended juvenile

justice to include young adults. In Germany, all young adults ages 18 to 21 are tried in juvenile court and the judges have an option to sentence them as a juvenile, if a consideration of the offender's personality and environment indicate that his psychological development was as a juvenile. *Id.* at 2. Sweden allows for young adults to be tried in juvenile court until their twenty-fifth birthday, and young adults 18 to 24 receive different treatment than adults. "For instance, statutory minimum sentences cannot be applied for young people age 20 or under." *Id.* at 3. The Netherlands has extended juvenile alternatives for young adults ages 18 to 21. *Id.*

¶ 57    Additionally, Illinois raised the age for a delinquent minor. Prior to January 1, 2014, a person who committed a felony prior to his or her seventeenth birthday was considered a delinquent minor. See 705 ILCS 405/5-105(3) (West 2012). However, Public Act 98-61 changed the definition of a delinquent minor to be, "any minor who prior to his or her 18th birthday has violated or attempted to violate, regardless of where the act occurred, any federal, State, county or municipal law or ordinance." Pub. Act 98-61, § 5 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-105(3)).

¶ 58    When we originally issued our opinion, we noted that in the Northern Illinois University Law Review note, the Supreme Court of Wyoming compiled a list of factors taken from *Miller* to consider in sentencing juveniles.

> "During a postconviction sentencing hearing, a trial court should scrutinize the following factors before sentencing a juvenile offender: (a) the character and history of the juvenile offender and the specific circumstances of the crime; (b) the background and emotional and mental development of the juvenile offender; (c) the offender's age and characteristics that go along with it including

immaturity and ability to appreciate risks; (d) the juvenile's family and home environment; (e) the circumstances of the crime, the extent to which the juvenile was involved, and the extent to which peer or familial pressure may have factored into the juvenile's participation; (f) 'the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney'; and (g) the offender's potential for rehabilitation." Dowling, *supra* at 634 (quoting *Bear Cloud v. State*, 2013 WY 18, ¶ 42, 294 P.3d 36 (2013), citing *Miller*, 567 U.S. at 475-78).

¶ 59    " '[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his culpability." *Miller*, 567 U.S. at 476 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982)). As the Supreme Court observed in *Graham*, "Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." *Graham*, 560 U.S. at 70.

¶ 60    "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 479. Under Illinois law, the harshest form of punishment is a mandatory life sentence. See 730 ILCS 5/5-8-1(a) (West 2014). The trial court is not afforded any discretion if an offender is found guilty of triggering offenses, such as, the death of more than one person. See *id.* § 5-8-1(a)(1)(c)(ii). However, when the death penalty still existed in Illinois, there were

several statutory guidelines that had to be met before such a sentence could be imposed. See 720 ILCS 5/9-1 (West 2010). The lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult.

¶ 61    Further, since our initial opinion was filed, the Illinois legislature enacted a statute codifying the *Miller* factors, similar to what the Supreme Court of Wyoming had done in *Bear Cloud*. Section 5-4.5-105(a) provides that when a person under 18 years of age commits an offense, the trial court at the sentencing hearing shall consider the following factors in mitigation: (a) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (b) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences; (c) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (d) the person's potential for rehabilitation or evidence of rehabilitation, or both; (e) the circumstances of the offense; (f) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense; (g) whether the person was able to meaningfully participate in his or her defense; (h) the person's prior juvenile or criminal history; and (i) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor. 730 ILCS 5/5-4.5-105(a)(9) (West 2016). Further, under section 5-4.5-105(c), the trial court has the

discretion to decline the imposition of sentencing enhancements based upon the possession or use of a firearm during the commission of the offense. *Id.* § 5-4.5-105(c).

¶ 62    Additionally since we vacated our previous decision, the Illinois General Assembly recently passed Public Act 100-1182 , which established a parole review for persons under the age of 21 at the time of the commission of an offense in section 5-4.5-110 of the Unified Code of Corrections. Pub. Act 100-1182 (eff. June 1, 2019) (amending 730 ILCS 5/5-4.5-110). Under the new statute, a person under 21 years of age at the time of commission of first degree murder and is sentenced on or after the effective date of the act shall be eligible for parole review after serving 20 or more years of his or her sentence, excluding those subject to a sentence of natural life. *Id.* Although the murder of two individuals is not included in the new legislation, this public act supports our reasoning and follows the recent trends discussed in our analysis that an individual under 21 years of age should receive consideration for their age and maturity level when receiving harsh sentences.

¶ 63    These considerations are significant in the instant case and support defendant's argument that the mandatory natural life sentencing statute is unconstitutional as applied to him. Turning to the case at bar, while clearly no longer a juvenile, defendant, at age 19 years and 2 months, was barely a legal adult and still a teenager when he committed these offenses. His youthfulness is relevant when considered alongside his participation in the actual shootings. Defendant's presentence investigation report showed that his only prior offenses were possession of a controlled substance with intent to deliver. Defendant did not have a criminal history of committing violent crimes. The sentencing hearing also disclosed that defendant never knew his father, he was raised by his maternal grandmother, and that his mother died when he was 18. Defendant attended high school through the twelfth grade, however, he never graduated.

¶ 64 At the time defendant was sentenced, the death penalty was still in place in Illinois. Although the trial judge found defendant eligible for the death penalty, he concluded that there were "sufficient mitigating factors to preclude the imposition of the death penalty." While some of these mitigating factors were before the trial court when it declined to impose the death penalty, they were not available to be considered before imposing a mandatory natural life sentence. The court's ability to take any factors into consideration was negated by the mandatory nature of defendant's sentence. The trial court was also precluded from considering the goal of rehabilitation in imposing the life sentence, which is especially relevant in defendant's case. Given defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community.

¶ 65 Our conclusion is not meant to diminish in any way the seriousness of the crimes, specifically two convictions for murder and two convictions for aggravated kidnapping. We recognize defendant remains culpable for his participation. However, we believe that defendant is entitled to a new sentencing hearing in which the trial court has the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude. Accordingly, we hold that defendant's sentence violates the proportionate penalties clause of the constitution as applied to him. We vacate defendant's sentence of natural life and remand for a new sentencing hearing. Further, at defendant's sentencing hearing, he will be given the opportunity to present evidence to support his claim that he does not deserve a mandatory sentence of natural life, as suggested in *Harris*. See *Harris*, 2018 IL 121932, ¶ 46.

¶ 66 Since we have held that defendant's sentence is unconstitutional as applied under the proportionate penalties clause, we need not address defendant's original arguments that the

imposition of a mandatory life sentence was facially unconstitutional under the eighth amendment and the proportionate penalties clause. Although, we do not generally make a specific recommendation to the trial court on remand as to an appropriate sentence, in this particular case, as pointed out above, we question the statutory requirement to impose a mandatory life sentence on a culpable lookout compared to the perpetrator who pulled the trigger and where a codefendant, although 17 years old, has been released from the penitentiary. The statute in its current form takes away the trial court's discretion and ability to consider any mitigating factors in this case.

¶ 67    We now return to the parties' agreed motion for summary disposition requesting a remand for second stage postconviction proceedings and which we deny for the reasons that follow.

¶ 68    First, we deny the remand request because the parties are asking this court to duplicate second stage proceedings that have already occurred. Notably, in postconviction review, if the circuit court does not dismiss the postconviction petition at the first stage as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2008)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2008)). At this stage, the circuit court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *Coleman*, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2008). Since second stage proceedings have already taken place, we will not duplicate them now.

¶ 69    Second, to proceed in this proposed piecemeal fashion is contrary to the Post-Conviction Act. The Illinois Supreme Court has held that a postconviction petition may not be dismissed piecemeal. *People v. Rivera*, 198 Ill. 2d 364, 370-71 (2001). The supervisory order from the Illinois Supreme Court mandated this court to reconsider only defendant's proportionate penalties argument. However, as noted previously, defendant raised several issues on appeal, and the Post-Conviction Act does not provide for proceeding in the manner suggested by the parties. Moreover, there is no statutory or case law authority to provide for a remand of a single claim for second stage proceedings after a second stage review has already occurred.

¶ 70    Third, the parties' position appears contrary to both of their earlier positions taken in this appeal. Defendant did not seek rehearing on this court's order to remand for a new sentencing hearing while the State opposed the relief we granted to defendant. Their seemingly contrary positions and concession to remand are not binding on this court. See *People v. Horrell*, 235 Ill. 2d 235, 241 (2009) (citing *Beacham v. Walker*, 231 Ill. 2d 51, 60 (2008) (A court of review is not bound by a party's concession.)). The only mandate issued to this court was to consider defendant's proportionate penalties argument in light of *People v. Harris*, 2018 IL 121932. We have a duty to adhere to the directives in the Illinois Supreme Court's mandate, and we have no authority to go beyond that mandate. See *Fidelity & Casualty Co. of New York v. Mobay Chemical Corp.*, 252 Ill. App. 3d 992, 997 (1992).

¶ 71    Fourth, defendant's postconviction petition was initially filed *pro se* in 2001. He was appointed counsel in 2003, and the amended postconviction petition was filed in 2010. Briefing was completed on appeal in March 2015, with our initial opinion filed in December 2015. Both parties filed petitions for rehearing, and this court ordered briefing on the State's petition with oral argument. Following our denial of the petitions for rehearing, the parties each filed their

respective petitions for leave to appeal to the Illinois Supreme Court in April and June 2017. The petitions were pending before the supreme court until November 2018. Given the passage of nearly two decades in the review of defendant's initial postconviction, the interests of judicial economy support remanding the case directly for a new sentencing hearing for the relief to which defendant is entitled. See *Buffer*, 2019 IL 122327, ¶ 47.

¶ 72    Based upon all of the above, we conclude that a new sentencing hearing is the appropriate relief for defendant's proportionate penalties argument. As in *Buffer*, we find that the record does not need further development before advancing to a hearing. At that hearing, both defendant and the State will have the opportunity to fully explore defendant's argument and the evolving science on juvenile brain development. The trial court will have the opportunity to evaluate the evidence presented to determine if defendant is entitled to a sentence of less than natural life imprisonment. The trial court can then also consider that Weatherspoon, who was a codefendant lookout, age 17 at the time of the offenses, and as culpable as defendant, if not more, has been resentenced and has now been released from the penitentiary.

¶ 73    At the new sentencing hearing, defendant could be sentenced to a term of years and based on the sentencing statutes in effect at the time of the offense, may be eligible for immediate release.

¶ 74    In a petition for rehearing, the State asserts that the proper result in this case is to remand for further second stage proceedings, as requested in the motion for summary remand. We point out that this position is contrary to what the State argued in its petition for rehearing following the initial opinion. In the petition, the State contended that "at best, this case should be remanded for a third stage evidentiary hearing where defendant could establish his constitutional violation by a preponderance of the evidence and where the People would be able to introduce evidence

proving otherwise." Whether the relief ordered by this court is a sentencing hearing or a third stage evidentiary hearing, the function remains the same. The only issue to be considered is whether defendant is entitled to a new sentence after both sides have had the opportunity to introduce evidence.

¶ 75    The State has also conceded in their petition for rehearing that there could be young offenders whose mandatory sentences are unconstitutional under the proportionate penalties clause. The State maintains that, under *Harris* and *People v. Thompson*, 2015 IL 118151, defendant has not sufficiently established his as-applied challenge to the proportionate penalties clause. We note that in *Thompson*, the defendant forfeited his as-applied challenge by raising it for the first time on appeal from the dismissal of petition for relief form judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)). Similar to the holding in *Harris*, the suprme court observed that the trial court was "the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge in this case." *Thompson*, 2015 IL 118151, ¶ 38. We have already distinguished this case from *Harris* and find the same reasoning applies to *Thompson*. In this case, defendant raised this claim in his amended postconviction petition in 2010, relying on *Leon Miller*, and before *Miller* had been decided. Defendant argued that the mandatory life sentence statute did not allow for "consideration of personal circumstances of the offender or the degree of his participation in the offense." Defendant contended that the distinction between the 15-year-old defendant in *Leon Miller* and other defendants was not substantial where "along the continuum of culpability, such that the discrepancy between a 15-year sentence for Miller and natural life for others, fairly similarly situated, is grossly excessive, so as to offend the conscience."

¶ 76    Finally, the State does not even discuss the fact that the 17-year-old codefendant Weatherspoon, who was similarly situated to defendant in terms of culpability, if not more, was automatically entitled to a new sentencing hearing and has since been released from the penitentiary while defendant, who was 19 years old and still a teenager, is serving a mandatory life in prison sentence. Given the facts of codefendant Weatherspoon's case, it is clear that the sentencing for young adults has evolved considerably over the last 20 years.

¶ 77    We affirm the dismissal of defendant's postconviction petition, vacate defendant's sentence, and remand for a new sentencing hearing in accordance with this decision. Mandate to issue *instanter*.

¶ 78    Affirmed in part, vacated in part, and remanded.