# Illinois Official Reports

## Appellate Court

---

### *People v. Lenoir*, 2021 IL App (1st) 180269

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES LENOIR, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-0269 |
| Filed<br>Rehearing denied | January 22, 2021<br>February 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-1517(01); the Hon. Kevin M. Sheehan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Melinda Grace Palacio, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and, Retha Stotts, Assistant State's Attorneys, of counsel), for the People. |

Panel
JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justice Connors concurred in the judgment and opinion.
Presiding Justice Mikva concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    Defendant, James Lenoir, appeals the circuit court's order denying him leave to file a successive postconviction petition. On appeal, defendant contends that the court's denial was error where his petition demonstrated actual innocence, based on three affidavits that he recently obtained. Defendant also contends that his petition established cause and prejudice for his claims that his confession was the result of physical coercion and his sentence violated the Illinois proportionate penalties clause. For the following reasons, we affirm the denial as to defendant's actual innocence and coercion claims. However, we reverse the trial court's denial as to his proportionate penalties claim and remand for further proceedings.

¶ 2                    JURISDICTION

¶ 3    The trial court denied defendant leave to file a successive postconviction petition on December 14, 2017. Defendant filed a notice of appeal on January 3, 2018. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651 (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                    BACKGROUND

¶ 5    Defendant and three codefendants were charged with first degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated battery in connection with the September 2006 shootings of Deonte Wright and Jose Perez.

¶ 6    Prior to his trial, defendant filed a motion to suppress his statements. In his motion, defendant alleged that his statements "were obtained as a result of physical, psychological and mental coercion." Defendant claimed that after he was arrested, he was brought to the interrogation room where he was handcuffed so tightly that his circulation was cut off. Defendant remained in the interrogation room for 24 hours. During that time, a "tall heavy set detective in his late 30's to early 40's" entered and "hit the defendant repeatedly with a book." Defendant alleged that he was allowed to use the bathroom only once while he was in the room, and he stayed in the room almost 24 hours before being fed a slice of pizza. Defendant was told by Assistant State's Attorney (ASA) Gregorovic that if he made a videotaped statement she would "get a deal for him."

¶ 7    At the hearing on defendant's motion to suppress, Detective Thomas Flaherty testified that he was investigating the murder of Wright when he received a call from Detective McDermott, who was in Lake County investigating a codefendant. Detective Flaherty learned that defendant was one of four suspects in the murder. He and other officers arrested defendant, brought him to Area 4, and placed him without handcuffs into an interrogation room. A few hours later, Detective Flaherty went into the room and advised defendant of his *Miranda* rights

(see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Detective Flaherty testified that he did not hit defendant with a telephone book, nor did he witness a tall, heavy-set detective hit defendant with a telephone book. He was present when ASA Gregorovic interviewed defendant later that morning, and he did not hear ASA Gregorovic tell defendant that she would get him a deal if he videotaped a statement. When he conducted a lineup including defendant as a subject later that evening, he did not notice any marks or injuries on defendant.

¶ 8     ASA Gregorovic testified that when she met with defendant in the interrogation room he was not handcuffed. She did not notice any injuries to defendant's wrists, and he never informed her that he was handcuffed so tightly that his circulation was cut off. She left the room but later returned and spoke to defendant in the presence of Detective McDermott. Defendant did not tell her that he had been hit with a telephone book or that he was not allowed to use the bathroom or eat. ASA Gregorovic did not promise defendant she would get him a deal in exchange for a videotaped statement. Defendant then was taken into a room at Area 4 to view a videotape from Lake County. Detective McDermott was present for the viewing, but ASA Gregorovic was not. When defendant came out of the room with Detective McDermott, he told ASA Gregorovic that he wanted to speak with her. Outside of the officers' presence, ASA Gregorovic and another ASA asked defendant how he had been treated by police, and he responded that he had been treated fine, was allowed to use the bathroom, and was given food and drink.

¶ 9     Detective McDermott testified at the hearing that he spent approximately 16 hours from September 18, 2003, to September 19, 2003, in Waukegan, Illinois, investigating a codefendant's involvement in the murder. After obtaining a videotaped statement from the codefendant, Detective McDermott told Area 4 officers to arrest defendant. McDermott stated that he was not present when defendant was arrested, nor did he handcuff defendant in the interrogation room. He first came into contact with defendant in the afternoon on September 19, 2003, when he was present for ASA Gregorovic's conversation with defendant. Detective McDermott took defendant to a room outside the presence of ASA Gregorovic, and they watched the videotape for about 15 to 20 minutes. He then left the room and told ASA Gregorovic that defendant wanted to talk to her. Detective McDermott did not hear ASA Gregorovic promise to get defendant a better deal in exchange for the statement.

¶ 10    Detective McDermott testified that they showed defendant his codefendant's statement because defendant was hesitant to implicate his codefendants. After watching his codefendant's statement, defendant felt "comfortable" talking because someone else was also talking. Detective McDermott denied that he or another officer struck defendant with a telephone book, and he was not aware of a short, heavy-set, balding detective in his 50's wearing large glasses who worked with defendant. The trial court denied defendant's motion to suppress his statement.

¶ 11    Defendant's trial began in August 2006. Donald Phillips testified that on September 16, 2003, Robert McClellan (Robert) was shot outside of defendant's house at 2319 West Jackson Boulevard in Saint Stephens Terrace in Chicago. After the shooting, defendant drove Phillips and codefendant Earl Faber to the hospital to visit Robert. The group planned to retaliate against the Black Disciples gang for Robert's shooting. On the way to the hospital, defendant picked up Leondray McClellan (Leondray), Robert's cousin.

¶ 12    At the intersection of Oakley Boulevard and Madison Street, the group identified a pair of Black Disciples and agreed to "get them." Defendant drove through an alley toward them, and

as he exited the alley onto Western Avenue, defendant saw Wright coming out of Walgreens. Phillips testified that defendant identified Wright as a Black Disciple gang member. Faber asked defendant if he was sure, and defendant answered, "I'm sure man; I know what I'm talking about." Defendant stopped the car, and Faber and Phillips exited the vehicle. Phillips saw Faber approach Wright and start to shoot. Wright ran onto Western Avenue, where he collapsed. Faber stood over Wright and shot him again. A stray bullet struck Perez as he sat in a car nearby.

¶ 13    Phillips and Faber ran toward the alley where defendant and Leondray were waiting in the car. Phillips slipped while running, and when Faber got to the car he left the scene with defendant and Leondray. Phillips ran to Saint Stephens Terrace where he reconnected with defendant, Faber, and Leondray. They agreed not to speak of the murder with anyone and went their separate ways.

¶ 14    At trial, defendant's videotaped statement was shown in which he talked about the shooting of Robert and how his codefendants wanted to retaliate for the shooting. Defendant told them that he wanted to go to the hospital to check on Robert, but his codefendants told him to first drop them off where some of the rival gangs were hanging around. When they spotted a rival gang member, defendant stopped the car and his codefendants jumped out. One of them started firing and defendant saw a person fall after getting shot. Defendant sped away from the scene because he was scared. When his codefendants ran back toward the car he did not stop. He saw his codefendants three to four hours later, and they told defendant not to say anything and "everything will be cool." He agreed because he saw that one of the codefendants had a gun in his back pocket, the same gun used in the shooting earlier that day. Defendant stated that he was not handcuffed during his interview with ASA Gregorovic, that the officers treated him fine, he was allowed to use the bathroom, and he was given food and drink. He stated that his statement was voluntary.

¶ 15    The jury found defendant guilty of first degree murder and attempted first degree murder. After hearing evidence in aggravation and mitigation, the trial court asked defendant if he had anything to say to the court. Defendant "declined his right of elocution."

¶ 16    In sentencing defendant, the court found that consecutive sentences shall be imposed where one of defendant's convictions was first degree murder and the other involved an offense where he inflicted serious bodily injury. Even though defendant was convicted on a theory of accountability, the court found that consecutive sentencing applied, citing *People v. Sangster*, 91 Ill. 2d 260 (1982). Before pronouncing his sentence, the court stated that defendant's "lust for retaliation *** resulted in the senseless killing of Deonte Wright a non-intended, non-gang member target, and the grave wounding of Mr. Jose Perez, an innocence [*sic*] bystander who was nothing more than in his car at that intersection of Madison and Western." The court found that it was defendant who summoned fellow gang members for revenge and told them that the Black Disciples were "shooting up" his territory. Defendant drove the car as he and his armed codefendants sought revenge, and "[i]t was defendant who targeted Deonte Wright, a bystander for death, by pointing him out as a BD with the words, 'That's the dude.' " The court sentenced defendant to consecutive terms of 30 years' and 18 years' imprisonment.

¶ 17    On direct appeal, defendant alleged that the trial court (1) erred in denying his motion to quash arrest and suppress evidence, (2) erred in precluding defense counsel from inquiring into potential juror's prejudices about the use of guns, (3) failed to instruct the jury to disregard certain evidence introduced through improperly worded questions, (4) erred in instructing the

- 4 -

jury on the defense of withdrawal, and (5) improperly communicated with the jury outside the presence of defendant. This court affirmed defendant's convictions and sentence but ordered a correction of the mittimus to show one conviction for first degree murder. *People v. Lenoir*, No. 1-07-1854 (2010) (unpublished order under Illinois Supreme Court Rule 23). Defendant's petition for leave to appeal was denied. *People v. Lenoir*, No. 111767 (Ill. Mar. 30, 2011).

¶ 18    On December 15, 2011, defendant filed a petition for postconviction relief and filed an addendum on February 27, 2011. Defendant made numerous allegations, including that his trial counsel was ineffective for failing to call witnesses at the suppression hearing to testify that they did not consent to entry of the home. He also alleged that trial counsel was ineffective for presenting his motion to suppress without properly investigating or reading police reports after he had advised counsel that he was beaten by officers. Defendant's petition stated that the "[i]nvestigating detective, Michael McDermott, went to Waukegan to question co-defendant," and as a result of that interview, "[D]etective McDermott called to area 4 police station to have [defendant] arrested. Consequently, detective Thomas Flaherty arrested [defendant] at his home address." The petition continued:

> "Upon motion to suppress statement, counsel questioned detective mcdermott [*sic*] (whom was actually the investigating detective, not the arresting officer), with questions relative to the arrest. Detective Mcdermott was unable to answer the questions because he was not the arresting officer. The court would need to review the record of the motion hearing to fully appreciate the blunderous examination of the witnesses by the defense counsel. This is reflective of counsel failure to read the police reports, which is a basic requirement in order to conduct an adequate inquiry at the motion hearing."

¶ 19    Defendant further contended that his trial counsel was ineffective for depriving him of his right to testify. In his affidavit accompanying the petition, defendant stated that if he had testified, he "could have clarified to the court the difference in the two sets of detectives, the ones that arrested [him] in Chicago, from the ones that interview[ed] [his] codefendant in Waukegan, and then called to area 4 police station in Chicago to have me arrested. This point was confusing to my counsel, by her not reading the police reports and investigating to be sure of the circumstances." Defendant stated that this was the reason "why counsel appeared confused and looked like she was on a fishing expedition during her examination of the state's witnesses."

¶ 20    Defendant's petition also alleged that appellate counsel was ineffective for failing to argue trial counsel's ineffective assistance, failing to argue that officers violated the knock and announce rule, failed to argue that the prosecution inflamed the prejudices of the jury, and that his codefendant's testimony was inconsistent with prior statements and was changed to blame defendant.

¶ 21    The trial court summarily dismissed defendant's petition on March 8, 2012, and denied his motion to reconsider. On appeal, counsel filed a motion for leave to withdraw that his court allowed after finding no issues of arguable merit. Defendant's petition for leave to appeal to the supreme court was denied. *People v. Lenoir*, No. 116399 (Ill. Sept. 25, 2013).

¶ 22    Defendant filed a *pro se* motion for leave to file a successive postconviction petition on August 5, 2013. In the petition, defendant alleged that he now had the Egan report that investigated police misconduct, including that of Detective McDermott, which was not previously available. The trial court denied the petition, finding that the report did not

constitute newly discovered evidence and defendant was not prejudiced because he never claimed that Detective McDermott physically abused him. The trial court further found that defendant did not establish a valid claim of actual innocence, and that he failed to establish cause and prejudice for his claims of perjury and ineffective assistance of trial counsel.

¶ 23    This court affirmed, finding that the report did not provide new evidence to corroborate defendant's claim that physical coercion was used by officers to obtain his confession. We also found that since there was no evidence that Detective McDermott engaged in physical coercion in defendant's case or that he knew about any acts of coercion that may have occurred, defendant's claim that Detective McDermott committed perjury in denying the use of physical coercion was not supported by the Egan report. See *People v. Lenoir*, 2016 IL App (1st) 141370-U. The supreme court denied defendant's petition for leave to appeal. *People v. Lenoir*, No. 120915 (Ill. Sept. 28, 2016).

¶ 24    On October 3, 2017, defendant filed his second postconviction petition. His petition raised six claims: (1) ineffective assistance of trial counsel for failing to interview witnesses who could corroborate defendant's claim of coercion; (2) ineffective assistance of appellate counsel for failing to raise the issue of prosecutorial misconduct; (3) actual innocence based on the affidavits of Chara Miller, Andre West, and Foster Lee; (4) his sentence violated the Illinois proportionate penalties clause where he was 18 years old when the offenses were committed and received a 48-year sentence; (5) newly discovered evidence in the form of Burton's affidavit established that Detective McDermott committed perjury at trial; and (6) the prosecutor's closing argument violated defendant's due process rights. The contents of these affidavits are set forth in our analysis as we consider defendant's claims on appeal.

¶ 25    The trial court denied leave to file the petition. It found that claims (4) and (6) involved "matters of trial record which could have and should have been raised on direct appeal of his conviction and sentence." As such, defendant waived consideration of these issues. Claims (1), (2), and (5) were raised in previous proceedings, and defendant did not show cause and prejudice why his specific claims could not have been raised earlier; furthermore, Burton's affidavit did not support defendant's perjury claim against Detective McDermott. Finally, the court found that defendant's actual innocence claim was "not properly supported by newly discovered evidence." Defendant could have raised this claim in his initial postconviction petition filed in 2011, "as his innocence and whereabouts were within his knowledge at that time." Defendant filed this appeal.

¶ 26                                        ANALYSIS

¶ 27    Defendant argues that the trial court improperly denied him leave to file a successive postconviction petition pursuant to section 122-1(f) of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2016)). The Act provides a procedure in which a criminal defendant may assert that his constitutional rights were violated in his original trial or sentencing hearing. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). A proceeding under the Act is a collateral one rather than an appeal of the underlying judgment, and it allows only for consideration of issues that were not, and could not have been, adjudicated on direct appeal. *Id.* Issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited. *Id.* at 502-03.

¶ 28    Although the Act contemplates the filing of only one postconviction petition, section 122-1(f) allows for the filing of a successive petition after obtaining leave of court. 725 ILCS 5/122-

1(f) (West 2016). For a successive postconviction petition, "the procedural bar of waiver is not merely a principle of judicial administration; it is an express requirement of the statute." *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002). However, the bar against successive petitions will be relaxed on the following grounds: (1) where defendant can establish cause and prejudice for failure to assert the claim in an earlier proceeding or (2) where defendant asserts actual innocence. *Id.* at 459. The trial court properly denies leave to file a successive postconviction petition "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. We review the trial court's denial of a successive postconviction petition *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 29 Defendant raises only three issues on appeal: (1) the affidavits of Miller, West, and Lee support an arguable claim of actual innocence; (2) newly discovered evidence in the form of Burton's affidavit supports his claims that trial counsel was ineffective for failing to investigate his coercion claim; and (3) he established cause and prejudice in his proportionate penalties claim where federal and state law supporting his position were not available at the time he was sentenced or when he filed his initial postconviction petition. We review the court's denial as to these issues only, and the remaining claims in defendant's successive petition are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in appellant's brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 30 We first address defendant's contention that the trial court erred in denying him leave to file his successive postconviction petition where the petition stated an arguable claim of actual innocence. In a successive postconviction proceeding, defendant's "failure to raise a claim in an earlier petition will be excused if necessary to prevent a fundamental miscarriage of justice." *Pitsonbarger*, 205 Ill. 2d at 459. To demonstrate a miscarriage of justice in this context, defendant "must show actual innocence." *People v. Edwards*, 2012 IL 111711, ¶ 23. "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 31 In his successive postconviction petition, defendant alleged that he was not in the car when the shootings occurred, but instead he was with his then-girlfriend, Miller. He attached the affidavits of Miller, Lee, and West in support.

¶ 32 In her affidavit, Miller stated that defendant was with her at the time of the shooting. She did not come forward with this information earlier because at the time of defendant's trial, she was dating Jerry Butts, who knew the victim's family. Miller stated that when she told Butts about defendant asking her to testify, Butts became upset, and she did not want to fight with him. She decided to come forward because defendant being in prison was "weighing heavily on [her] mind."

¶ 33 Lee's affidavit stated that around 2:30 or 3 p.m., he saw defendant "pull-up in a blue box chevy, in front of Chara['s] house." He noticed other people in the car as defendant got out. Defendant told Lee that there was a shooting earlier at St. Stephens. Lee continued:

> "6.) The dudes in the car was telling [defendant] to go in the house [defendant] told them to pull off then come back to get him. I remember seeing a dark skin dude get out the back seat then got in the driver seat. The car pulled off as [defendant] walked up

the stairs to go in the house. He said he'll holla at me later. Then [defendant] walked in the front door of Chara['s] house.

7.) I started walking down Warren towards Oakley. Within a few minutes, I heard about five shots go off on the next block. Which is Madison."

Lee stated that he "seen [defendant] walk in Chara['s] house minutes before the shooting happen. I didn't see him come back out." He further stated that he "was scared to come forward before today with this information, because if my gang would have found out I was helping [defendant] I could have got hurt. I am no longer part of a gang."

¶ 34 In his affidavit, West stated that he had gone with defendant, Faber, and Phillips to the hospital to visit Robert, who had been shot. When they returned, defendant said he was going to check on Miller because she had called him. Before going to her, defendant was going to visit "Lil Rob" McClellan so he, Faber, and Phillips got into the car. West continued:

"Around about 2:00 pm to 3:00 pm, I was standing on the front of 2325 building facing Oakley street [*sic*] in the complex, I seen [Faber] and [Phillips] jumping the back gate on Oakley st. into the complex. When they ran into the building. [*sic*] I ask where y'all just came from and where was [defendant] *** [Phillips] said [defendant] was still at CHARA house."

As West stood talking to Faber and Phillips, defendant called him and said that someone just got shot on Madison Street. Faber and Phillips said Lil Rob had the car so West used another car to get defendant from Miller's house. West did not come forward with this information earlier because he was scared. However, seeing defendant's son and mother was "starting to hurt [him] mentally and emotionally" so he was now willing to testify.

¶ 35 To establish actual innocence, the evidence supporting defendant's claim must be newly discovered. Newly discovered evidence is evidence that was not available at the defendant's original trial and that the defendant could not have discovered sooner through diligence. *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Defendant concedes that Miller's affidavit is not newly discovered, as the exculpatory information contained therein was known to him prior to trial.

¶ 36 We find that the same conclusion applies to Lee's affidavit. Lee was present when defendant told the others to take his car and then come back to get him. Lee saw another person get into the driver's seat of the car, and defendant told Lee he would "holla at [him] later" before defendant walked into Miller's house. Since defendant was aware of Lee's presence when these events took place, the information in Lee's affidavit was known to defendant before his trial. As our supreme court noted in *Robinson*,

"to the extent that the affidavit includes information that can be construed as alibi evidence, [defendant] obviously was aware of that information prior to trial, and there is no indication that [his] attorney attempted to subpoena these witnesses to testify at trial, nor is there any explanation of why subpoenas were not issued." *Robinson*, 2020 IL 123849, ¶ 53.

As a result, the content of Lee's affidavit is not newly discovered and cannot support his claim of actual innocence. *Id.*

¶ 37 Regarding West's affidavit, even if we presumed that the information contained therein was newly discovered, it was not of such conclusive character that it would probably change the result on retrial. West's affidavit stated that he saw defendant get into a car with Faber and Phillips and later he saw Faber and Phillips jumping the back gate to the housing complex.

When he asked them where defendant was, they told him defendant was at Miller's house. West's affidavit contains no information on the whereabouts of defendant when the shooting occurred. West did not witness the shooting nor did he witness defendant enter Miller's house before the shooting. It is unlikely that West's testimony would have altered the results of defendant's trial.

¶ 38        For these reasons, we find that defendant has not made a substantial showing of actual innocence based on the affidavits of Miller, Lee, and West, and the trial court properly denied him leave to file a successive postconviction petition on this claim.

¶ 39        Defendant also argues that his successive petition demonstrated cause and prejudice regarding his claim that counsel failed to fully investigate defendant's allegations of coercion. The court may grant leave to file a successive postconviction petition "if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2016). "Cause" is "any objective factor, external to the defense, which impeded the petitioner's ability to raise a specific claim in the initial post-conviction proceeding." *Pitsonbarger*, 205 Ill. 2d at 462. To satisfy the prejudice prong, defendant must show that the claim not raised in his initial postconviction petition "so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* at 464.

¶ 40        Defendant relied on Burton's affidavit to support his ineffective assistance of counsel claim. Defendant contends that the affidavit corroborated his coercion claim and thus showed that trial counsel was ineffective for failing to secure evidence in the form of Burton's statements. The question before us is whether defendant established cause for failing to raise this particular claim in an earlier proceeding and prejudice such that the failure to do so violated his due process rights. *Id.* at 462, 464.

¶ 41        We note that defendant raised claims of ineffective assistance of trial counsel in his initial postconviction petition. In that petition, defendant argued that his trial counsel provided ineffective assistance regarding his coercion claim. He alleged that counsel failed to read the police reports that stated McDermott was interrogating a codefendant in Waukegan at the time defendant was arrested and confused McDermott with the officers who had arrested him. Defendant also raised an ineffective assistance claim regarding counsel's failure to interview witnesses. As defendant could have also raised his current ineffective assistance of counsel claim in his initial petition, the issue is forfeited on appeal. *Towns*, 182 Ill. 2d at 502-03 (issues previously raised and decided on are barred by *res judicata*, and issues that could have been raised but were not are forfeited).

¶ 42        Furthermore, defendant has not shown cause for failing to obtain Burton's affidavit and raise this issue in his initial postconviction petition. Defendant alleged in his petition that, after his FOIA request, he received photographs of the lineup he participated in at the police station on September 22, 2014. From there, he identified Burton as being present in the station on the day he was arrested. Defendant reached out to Burton, and Burton agreed to make an affidavit, which defendant received on November 18, 2014. Defendant stated that he "could not bring his claim earlier due to having a [*sic*] appeal being argued *** [a]t the time of obtaining this affidavit."

¶ 43        Defendant, however, knew of Burton's presence at the police station when he was arrested and yet gives no reason why it took so long to identify him. Defendant presumably knew that the person he saw in the station was also placed in a lineup with him. Burton's affidavit

confirms that defendant knew of his presence in the police station when defendant was arrested and interrogated. In his affidavit, Burton stated that, in the "early morning hours of September 19th 2003," he was handcuffed to a bench in the office area of the homicide unit of the police station at Harrison Street and Kedzie Avenue. While handcuffed, Burton observed

> "McDermott [come] out the first room, where the fighting was[,] with a light skinned boy with braids. *He James Lenoir looked over at me.* He walked pass [*sic*], looked like he was hurt and tired. McDermott took him into another room then placed me in the room that James Lenoir came out of, the light skinned boy with braids. I had seen him before when I use to go in the projects but never knew his name. I was placed in a lineup with James Lenoir and four more other people." (Emphasis added.)

Since defendant knew of Burton's presence in the police station at the time the coercion allegedly occurred, he would have known prior to trial that his trial counsel failed to interview Burton. As defendant failed to state an objective factor, external to the defense, that impeded his ability to raise this ineffective assistance of counsel claim in his initial petition, defendant has not established cause. *Pitsonbarger*, 205 Ill. 2d at 462. Since defendant must satisfy both prongs of the test, the trial court properly denied his motion for leave to file a successive postconviction petition based on this claim. *People v. Guerrero*, 2012 IL 112020, ¶ 15.[1]

¶ 44    Defendant's final contention is that his successive petition demonstrated cause and prejudice regarding his claim that his sentence violated the proportionate penalties clause of the Illinois Constitution. Defendant was sentenced to 48 years' imprisonment. Pursuant to section 3-6-3(a)(2)(ii) of the Unified Code of Corrections (Code), defendant must serve his 30-year sentence for first degree murder at 100%, and he must serve his consecutive sentence of 18 years for attempted murder at 85%. 730 ILCS 5/3-6-3(a)(2)(ii) (West 2016). Since defendant must serve 45 years of his 48-year sentence, it is a *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 41 (concluding that a sentence of more than 40 years is a *de facto* life sentence for a juvenile defendant); see also *People v. Coty*, 2020 IL 123972, ¶ 47 (finding that a term of 50 years in prison for an adult defendant is a *de facto* life sentence).

¶ 45    Defendant asserted that, at 18 years old, his brain was not fully mature. His petition cited studies finding that the part of the brain responsible for controlling impulses does not fully develop until a person reaches his or her early twenties. Citing the *Miller v. Alabama*, 567 U.S. 460 (2012), line of cases, and *People v. House*, 2019 IL App (1st) 110580-B, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020), defendant contended that even though he was not a juvenile, his *de facto* life sentence of 48 years' imprisonment, imposed without due consideration of the characteristics of youth, was unconstitutional.

¶ 46    Defendant claims he has shown cause where *Miller*, *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and *House* were all decided after he filed his initial postconviction petition in 2011. The State responds that the lack of precedent for a claim does not constitute cause for failing to raise it. In the cases cited as support, however, the court found no cause where defendant's claim was "not so novel that it lacked a legal basis." See *People v. Leason*, 352 Ill. App. 3d 450, 455 (2004); see also *People v. McDonald*, 363 Ill. App. 3d 390, 394 (2006) (no cause

---

[1]Although defendant raised an ineffective assistance of counsel issue in his successive petition, on appeal he contends he raised a coercion claim. Since he asserted a coercion claim in his first successive petition, it is *res judicata*. Nonetheless, for the same reasons applicable to his ineffective assistance claim, we find defendant has not established cause as to his coercion claim.

established where the new case relied on by defendant did not "involve novel legal analysis"). We disagree that these cases preclude defendant from establishing cause here.

¶ 47 Unlike the cases relied on in *Leason* and *McDonald*, *Miller* announced a new substantive rule. See *People v. Davis*, 2014 IL 115595, ¶ 38. Our supreme court further determined that "[i]n terms of the requisite cause and prejudice of the Post-Conviction Hearing Act, *Miller*'s new substantive rule constitutes 'cause' because it was not available earlier to counsel." *Id.* ¶ 42. Additionally, not until *People v. Harris*, 2018 IL 121932, did our supreme court hold that *Miller* applied to postconviction proceedings. We therefore find that defendant has demonstrated cause.

¶ 48 To obtain leave to file a successive postconviction petition, defendant must also establish prejudice regarding his claim that his sentence violated the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). Our supreme court has never defined what constitutes a cruel or degrading sentence that is "wholly disproportionate to the offense" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. To determine whether defendant's sentence is disproportionate, "[w]e review the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 49 We find *House* instructive. In *House*, the 19-year-old defendant was convicted of two counts of first degree murder where he acted as a lookout during the commission of the offense. *House*, 2019 IL App (1st) 110580-B, ¶ 29. Since he was found guilty under a theory of accountability, he was considered as responsible as those who actually committed the murders. *Id.* As a result, the defendant received a sentence of mandatory natural life in prison pursuant to section 5-8-1(a)(1)(c)(ii) of the Code (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998)). *House*, 2019 IL App (1st) 110580-B, ¶ 29.

¶ 50 The defendant argued that his sentence violated the proportionate penalties clause as applied to him, where "he had just turned 19 years old at the time of commission of the murders, was minimally culpable, and had no prior violent criminal history, but he received a mandatory natural life sentence without the consideration of these mitigating factors." *Id.* ¶ 33. The court in *House* found that "his young age of 19 is relevant under the circumstances of this case." *Id.* ¶ 46. The court noted recent research indicating that the brains of young adults continue to develop into the mid-twenties and as a result, young adults are more like adolescents than adults in important ways. *Id.* ¶ 55.

¶ 51 The court also noted that the evidence at trial established that the defendant was not at the scene of the murders, "but merely acted as a lookout near the railroad tracks. There was no evidence that defendant helped to plan the commission but instead took orders from higher ranking UVL members." *Id.* ¶ 46. The court was particularly concerned that because he was convicted on a theory of accountability, the defendant received the same mandatory life sentence as his codefendant who pulled the trigger. *Id.* Given the defendant's young age, and the fact that the trial court could not duly consider the mitigating factors of his youth or the

circumstances of his case, the court found "that defendant's mandatory sentence of natural life shocks the moral sense of the community." *Id.* ¶ 64.

¶ 52 Like the defendant in *House*, defendant here has consistently stated that he had minimal involvement in the shootings that killed Wright and injured Perez. In his videotaped statement, defendant said he told his codefendants he wanted to go to the hospital to check on Robert, but they told him to first drop them off where some of the rival gangs were hanging around. When they spotted a rival gang member, defendant stopped the car and his codefendants jumped out. One of them started firing, and defendant saw a person fall after getting shot. Defendant sped away from the scene because he was scared. In his successive petition, defendant stated that

> "[he] never had a gun, nor did he share a criminal intent to shoot anyone. He was held accountable for the actions of his co-defendants. [His] only motive was to go check on his girlfriend, than [*sic*] go see his friend in the hospital.

> * * *

> He was the youngest of his co-defendants[,] he didn't have a major violent criminal history, and [had] a higher probability of being rehabilitated. [Defendant] was shot at twice in the same morning of 9-16-03, yet he never armed himself. [He] had only begun to mature yet he lacked the ability to resist his susceptibility to the influence of his older co-defendants."

¶ 53 In the context of successive postconviction proceedings, the court accepts as true the well-pleaded allegations in the petition unless they are positively rebutted by the trial record. *Robinson*, 2020 IL 123849, ¶ 45. The only testimony at trial that showed defendant was actively involved in the plan to shoot rival gang members was that of codefendant Phillips. At defendant's trial, Phillips testified that defendant saw Wright coming out of Walgreens, and defendant identified Wright as a Black Disciple gang member. Phillips further testified that when codefendant Faber asked defendant if he was sure, defendant answered, "I'm sure man; I know what I'm talking about."

¶ 54 We note, however, that in exchange for his trial testimony, Phillips obtained a plea deal from the State in which he pleaded guilty to conspiracy to commit murder and attempted murder, and received consecutive prison sentences of 14 years and 6 years, respectively. While we acknowledge that the jury was aware of the deal and found Phillips's testimony credible, we cannot say that, given this circumstance, Phillips's testimony positively rebuts defendant's well-pleaded allegations in his successive petition. See *id.* ¶ 60 (clarifying that at the leave-to-file stage of successive proceedings, "the well-pleaded allegations in the petition and supporting documents will be accepted as true unless it is affirmatively demonstrated by the record that a trier of fact could never accept their veracity"). We also point out that in Faber's statement that was introduced as evidence at his trial, Faber said it was Phillips who spotted Wright and identified him as a rival gang member before the shooting. *People v. Faber*, 2016 IL App (1st) 133738-U, ¶ 24. Thus, for purposes of reviewing defendant's petition, we take as true his well-pleaded allegation that he was simply driving the car and had minimal knowledge of, or involvement in, the shootings.

¶ 55 Defendant was 18 years old when the crimes occurred, and we find that "his young age *** is relevant under the circumstances of this case." *House*, 2019 IL App (1st) 110580-B, ¶ 46. This is particularly true where defendant was convicted on a theory of accountability and has alleged minimal participation in the crime. Defendant is now serving a sentence that is

- 12 -

more than twice the amount of time Phillips is serving, even though it was Phillips who exited the car with Faber and chased down Wright before he was shot.

¶ 56    Furthermore, our supreme court has acknowledged that an 18- or 19-year-old defendant may raise an as-applied proportionate penalties claim based on *Miller* in postconviction proceedings, given the evolving science of young adult brain development. See *Harris*, 2018 IL 121932, ¶ 48; *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44. The court has yet to give guidance on what a young adult defendant must show to obtain relief. However, recent cases from this court have allowed 18- and 19-year-old defendants to file their successive petitions where they alleged that their brains were more similar to an adolescent brain and alleged facts specific to their circumstances. See *People v. Daniels*, 2020 IL App (1st) 171738; *People v. Ross*, 2020 IL App (1st) 171202. These cases reasoned that our supreme court opened the door for such claims in postconviction proceedings, and young adult defendants should have the opportunity to demonstrate that because of their age their sentences are cruel, degrading, or so wholly disproportionate to the offense that they shock the moral sense of the community. *Daniels*, 2020 IL App (1st) 171738, ¶ 25; *Ross*, 2020 IL App (1st) 171202, ¶ 26.

¶ 57    Like the defendants in *Daniels* and *Ross*, defendant here asserted facts particular to his case that supported his proportionate penalties claim. Defendant alleged that, at 18 years old, his brain was not fully mature. He cited studies finding that the part of the brain responsible for controlling impulses does not fully develop until a person reaches his or her early twenties. He stated that he was the youngest of the codefendants, and that he did not have a violent criminal history. He asserted that he was immature and susceptible to the influences of his older codefendants when the offenses occurred. For these reasons, we find that defendant established prejudice.

¶ 58    The State counters that *House* is distinguishable because the defendant there received a mandatory natural life sentence whereas defendant here received a discretionary *de facto* life sentence. We emphasize that the court in *House* did not find any one factor dispositive in its determination. As this court has noted, nothing in *House* suggests "that a defendant's degree of participation in a crime or discretionary sentence should utterly disqualify him or her from raising" a proportionate penalties claim based on *Miller*. *Daniels*, 2020 IL App (1st) 171738, ¶ 31. We disagree that defendant's discretionary sentence necessarily precludes him from raising his proportionate penalties claim. In fact, our supreme court explicitly found that *Miller* applies to discretionary life sentences. *People v. Holman*, 2017 IL 120655, ¶ 40.

¶ 59    The State also urges us to follow *People v. Handy*, 2019 IL App (1st) 170213, where the court found that the 18-year-old defendant did not establish prejudice on his claim that his 60-year sentence violated the proportionate penalties clause. In finding no showing of prejudice, the court stated that "we cannot overlook defendant's active participation where he invaded the victims' house with the codefendants, held a gun to Mr. W.'s head to prevent him from interfering while the codefendants robbed and attacked his family and kidnapped his young daughter, and then actively participated in the gang rape." *Id.* ¶ 40. The defendant's discretionary sentence was also a factor. *Id.* ¶ 41. The court reasoned that "[b]ecause defendant was an adult, an active participant in the crimes, and received a discretionary sentence, he is not entitled to a new hearing for a more in-depth consideration of his youth." *Id.*

¶ 60    *Handy* is distinguishable. Unlike the defendant in *Handy*, who physically committed the offenses underlying his convictions, defendant here was convicted on a theory of accountability. Taking as true defendant's well-pleaded allegations in his petition, defendant

was merely driving the car when his codefendants spotted Wright and exited the car to shoot him. As such, defendant's case is more similar to *House*. Accordingly, we maintain our finding that defendant has shown prejudice for failing to raise his proportionate penalties claim in an earlier proceeding.

¶ 61      In coming to this determination, we do not discount the seriousness of defendant's offenses nor do we make any determination as to defendant's degree of culpability for participating in the crime. We find only that defendant has satisfied the cause-and-prejudice test and that he should be granted leave to file his successive petition on this claim.

¶ 62                                              CONCLUSION

¶ 63      For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded for the trial court to allow defendant to file his successive postconviction petition. Upon remand, the court should also appoint counsel to represent defendant.

¶ 64      Affirmed in part and reversed in part; cause remanded with directions.

¶ 65      PRESIDING JUSTICE MIKVA, concurring in part and dissenting in part:

¶ 66      I agree fully with the majority that Mr. Lenoir should be permitted to file a successive postconviction petition on his proportionate penalties claim. *Supra* ¶¶ 47, 59. However, because I believe that Mr. Lenoir has demonstrated cause and prejudice as to his other two claims as well, I dissent as to the majority's decision to refuse to allow Mr. Lenoir to proceed on those claims. *Supra* ¶¶ 38, 43. I will briefly outline my reasons.

¶ 67      First, in reference to his claim of actual innocence, I agree with Mr. Lenoir that Mr. Lee's affidavit was newly discovered. Mr. Lee said in his affidavit that he "was scared to come forward before today with this information, because if my gang would have found out I was helping [defendant] I could have got hurt. I am no longer part of a gang." Our supreme court has recognized that "newly discovered" witnesses, in the context of an actual innocence claim, include previously known witnesses who would have been unwilling or unable to testify. *People v. Coleman*, 2013 IL 113307, ¶ 102.

¶ 68      The majority in this case cites our supreme court's recent decision in *People v. Robinson*, 2020 IL 123849, for the proposition that an alibi witness cannot be newly discovered. See *supra* ¶ 36. But that proposition in *Robinson* was in the context of whether the defendant's own affidavit was newly discovered. *Robinson*, 2020 IL 123849, ¶ 53. Our supreme court in *Robinson* accepted the assumption, made by the trial court and the appellate court in that case, that an alibi witness, similar to Mr. Lee in this case, who did not want to testify earlier because of the " 'code of silence' " imposed by their gang, was "newly discovered" for postconviction purposes. *Id.* ¶¶ 29, 54.

¶ 69      If we accept that Mr. Lee's affidavit was "newly discovered," that new information, confirmed in part by Mr. West's affidavit—that Mr. Lee saw Mr. Lenoir go to his girlfriend's house rather than accompany his fellow gang members when the revenge shootings occurred— could support an actual innocence claim.

¶ 70      I also think that Mr. Lenoir has shown cause and prejudice for his failure to present new evidence on his police coercion claim. First, I agree with Mr. Lenoir that his *pro se* petition,

broadly read, makes a coercion claim as well as an ineffective assistance of counsel claim. We are instructed to read *pro se* postconviction petitions and supporting documents liberally and as true, not in the technical manner that the State and majority in this case read Mr. Lenoir's petition. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 72 (citing *People v. Coleman*, 183 Ill. 2d 366, 388 (1998)); see also *People v. Pack*, 224 Ill. 2d 144, 150 (2007) ("[t]he Act should be liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights" (internal quotation marks omitted)).

¶ 71        I would allow a successive petition on Mr. Lenoir's coercion claim based on what I view as the newly discovered evidence of Mr. Burton's affidavit. Mr. Burton's affidavit says that he was at the police station when Mr. Lenoir claims he was physically coerced by the police into giving a statement. Mr. Burton said in his affidavit that he heard an unnamed detective say that he would talk to him, referring to Mr. Lenoir, and then grabbed what looked like a phone book with tape on it, which was what Mr. Lenoir says he was beaten with. The detective went into the room that Mr. Lenoir was in and it sounded like someone was fighting. According to Mr. Burton's affidavit, he could hear someone saying, "you know who killed him, just tell us who killed him." He then saw Mr. Lenoir coming out of the interrogation room looking "hurt and tired."

¶ 72        In my view, Mr. Lenoir has shown cause for not discovering Mr. Burton as a witness to the alleged police coercion. In his affidavit, Mr. Lenoir says that it was not until Mr. Lenoir was able to review the photos of his lineup in response to his FOIA request that he realized that Mr. Burton was present at the police station. At that point, he reached out to him and got the affidavit. Thus, I would allow the petition to proceed on this claim also.