2022 IL App (1st) 191775-U
No. 1-19-1775
Order filed January 24, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9829 |
| | ) | |
| DAVID MYRICK, | ) | Honorable |
| | ) | Arthur F. Hill, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's summary dismissal of defendant's postconviction petition over his contention that counsel was ineffective for failing to adequately corroborate his alibi defense at trial.

¶ 2    David Myrick appeals the summary dismissal of his petition for relief under the PostConviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). He argues that the trial court erroneously summarily dismissed his petition. He contends that he stated the gist of a claim for ineffective assistance of trial counsel in investigating and adequately corroborating his alibi. We affirm. Myrick has not demonstrated that counsel's failure to adequately corroborate his alibi with

his bank statements to have arguably prejudiced him, and there is no reasonable probability that the outcome would have been different had his counsel introduced the bank statements.

¶ 3                                                 Background

¶ 4     Following a jury trial, Myrick was convicted of attempted first degree murder of Joseph Kemp and sentenced to 46 years' imprisonment. We affirmed on direct appeal. *People v. Myrick*, 2020 IL App (1st) 170984-U (unpublished order under Illinois Supreme Court Rule 23). We set out those facts necessary to our disposition.

¶ 5     Private counsel represented Myrick at trial. Kemp testified that in the early morning on October 2, 2012, he went to Allen Johnson's house to purchase loose cigarettes. He saw Myrick, Tony Russell, and "Sinai" on the front porch when he arrived. Kemp knew all three men and identified Myrick in court. Two days before the shooting Kemp saw Myrick driving an Infiniti. He gave Myrick a "head nod" to say, "what's up."

¶ 6     Kemp spoke with the men on the porch for more than a half-hour and bought two loose cigarettes from Russell. The men were loading bags into Myrick's white industrial van and said they were delivering phone books out-of-state.

¶ 7     Kemp went to a residence across the street, known as a "drug spot," to see his cousin. Myrick and the other two men got into the van and drove away. As Kemp spoke with someone in the living room, the front door opened, and Myrick stood in the doorway. Myrick, pointing a black gun at Kemp, accused Kemp of stealing his "s***." Kemp laughed and denied taking anything belonging to Myrick. Then, Myrick fired the gun at Kemp, hitting him. Kemp fell to the ground; Myrick walked toward him and continued shooting, hitting him 11 times. He spent seven weeks

in the hospital, had 19 surgeries, and "died in the hospital three times," so "they had to bring [him] back to life."

¶ 8     When the police arrived, Kemp told them that "David" shot him, but he did not know Myrick's last name. He also told them where he thought Myrick used to live. On November 15, 2012, Kemp spoke with Detective Edward Louis and again said to him that "David," whom he had known since elementary school and was in his grade, shot him. Kemp continued to look for a photograph of Myrick because he knew Myrick was the shooter but did not know his last name. Kemp described the shooter as being around 30 years old, about 5'8, and weighing 225 pounds, with a dark complexion and short haircut. He said the shooter had a "lazy eye" "like his eye was roaming."

¶ 9     In January 2013, Kemp saw a photograph of Myrick on Facebook and recognized him as the shooter. Kemp identified Myrick as the shooter in a physical lineup four months later. He also identified various photographs of the residence where he was shot and the porch he stood on with Myrick, Russell, and Sinai. Kemp acknowledged he had five convictions for manufacture and delivery of a controlled substance.

¶ 10     On cross-examination, Kemp acknowledged that Myrick's eyes at trial were not "roving or crossed." Detective Louis brought him "books" from his elementary school. Still, he did not see a photograph of himself or Myrick. In November 2012 when Kemp spoke with Louis, he answered questions but could not recall precisely what was asked of him because he was on medication. Kemp acknowledged that he was informed that dying three times would affect his memory. Yet, he clarified that he did not forget the shooter's face and reiterated that Myrick shot him.

¶ 11    Chicago Fire Department paramedic Wesley Metcalf testified he treated Kemp at the scene and transported him to the hospital. Kemp was conscious, aware of his surroundings, and answered questions appropriately.

¶ 12    An evidence technician photographed and recovered seven fired bullet casings from the residence. Three casings were outside, and four were inside. Ballistics testing revealed the same gun fired all seven casings.

¶ 13    Detective Louis testified that he spoke with Kemp in November 2012, for 10 minutes. Bedridden, Kemp had just been released from the hospital. He could speak but was in much pain. Kemp told him that the shooter's eye "drifted" and explained that he knew the shooter from elementary school. Kemp also stated that the shooter went to Morrill Elementary School and Gage Park High School and gave Myrick's address. Louis attempted to find "David." In January 2013, Louis learned Kemp saw a photograph of the shooter. Louis learned Myrick's name and birthdate and obtained a photograph of him based on information received. Later, Louis put out an investigative alert for Myrick. Louis identified Myrick in court. He learned police had arrested Myrick on April 22, 2013, and Kemp identified Myrick in a lineup on April 23.

¶ 14    On cross-examination, Louis testified he did not go to Columbus, Ohio, to investigate the shooting because that location did not appear in the investigation.

¶ 15    Chicago police officer Michael Knight testified that on April 22, 2013, he ran the registration on and issued a parking ticket for a "white box truck" similar to a U-Haul. After running the registration, Knight learned the car's owner had an investigative alert placed on him. Based on that information, he later arrested and processed Myrick, who was 30 years old, 5'10, weighed 220 pounds, and had short hair and a dark complexion.

¶ 16    Myrick testified that he grew up on the 6100 block of South Maplewood Avenue. In 2012, he owned a small business and was employed as a subcontractor delivering phonebooks "all over the United States." That September, he had a job delivering phonebooks in Columbus, Ohio, in his white van, although he lived in Chicago. He traveled to Ohio with Anthony Coles. He estimated Columbus was about a five-and-a-half-hour drive from Chicago.

¶ 17    While working in Columbus, Myrick stayed at Value Place Hilliard, a stay he paid for with his Chase debit card. He identified (i) his hotel bill, which showed he stayed from September 12, 2012, through October 10, 2012; (ii) a receipt with his signature showing he paid with his Chase Visa card; (iii) an occupancy agreement with his signature; and (iv) a laundry card agreement with his signature. Myrick agreed that his signatures on the laundry agreement and Visa receipt did not match his signature on the "registration." He explained that he was in Columbus on October 2, 2012, but left on October 3, 2012, to deliver some equipment in Hammond, Indiana. Because he was "in a rush for a job" in Hammond on October 3, 2012, he "signed differently" by signing his first name only.

¶ 18    Myrick denied knowing or working with Russell and Sinai. He had never owned a gun. Myrick acknowledged that he knew Kemp but denied shooting him. He further acknowledged that he and Kemp attended the same elementary school but denied attending the same high school. Myrick also denied owning an Infiniti.

¶ 19    On cross-examination, Myrick testified in 2012, that he was 29 years old, 5'10, weighed 215 pounds, and had short hair and a dark complexion. He acknowledged he had been in a dance group with Kemp's brother in high school and owned a white van. Myrick knew Johnson, who lived around the corner from his Chicago home. Johnson had worked on Myrick's van in 2012.

Myrick knew Coles from his neighborhood but could not spell his name. He had not talked to Coles since about a month after their job in Columbus. He acknowledged Coles stayed with him in Ohio but that Coles' name and signature did not appear on the hotel documents. Myrick further admitted that the hotel documents showed "daily bills," but there was no video of him physically present at the hotel.

¶ 20     Each day, while working in Columbus, Myrick and Coles left the hotel to deliver phone books. He could not recall which specific areas he delivered books on various days, but he delivered where the contracts specified. Myrick acknowledged that the hotel had video equipment. The hotel room was like a studio apartment, and he bought groceries every few days. But, he did not have receipts or documents for the groceries "other than his bank history." Myrick got gas for his truck "[e]very day or every other day" in different areas of Columbus and used GPS to get around. He did not have receipts for gas but had "all of the transactions on [his] Chase debit card history account."

¶ 21     In rebuttal, Allen Johnson testified that, in 2012, he lived in the basement in the building in which Russell lived on the second floor. Johnson was a mechanic and knew Myrick because he fixed Myrick's white van some six months before the shooting. On the day of the shooting, Myrick and Sinai knocked on Johnson's door. Russell came downstairs. Johnson spoke with Myrick for about two minutes before going back to his apartment; Myrick said they were going to Minnesota to deliver phone books. After returning to the basement, Johnson heard gunshots. When he walked upstairs, police were there. Johnson did not see the shooting but was "positive" that he saw Myrick with Russell and Sinai that day.

¶ 22    On cross-examination, Johnson said that, after the shooting, Russell never returned to the building where they lived. He heard Russell was wanted for a different shooting.

¶ 23    The jury found Myrick guilty of two counts of attempted first degree murder and that he had personally discharged the gun during the commission of the offense. It also found him guilty of aggravated battery with a firearm.

¶ 24    With the assistance of a public defender, Myrick filed a motion for new trial, alleging, in part, ineffective assistance of trial counsel for failure to subpoena: (i) hotel staff to verify he was staying at the hotel at the time of the shooting; (ii) a warehouse supervisor to verify Myrick worked on October 2, 2012; (iii) video documentation to corroborate he was in Ohio; or (iv) additional documentation or verification of Myrick's alibi. The public defender acknowledged Myrick submitted work invoices to trial counsel, but the invoices were not dated October 1, 2, or 3, 2012.

¶ 25    At the hearing on the motion, trial counsel testified he was hired to represent Myrick in June 2013. He received documents from Value Place Hilliard, where Myrick alleged he was staying at the time of the shooting. Counsel had "a lot of contact with the hotel" over the phone, and "hotel people" and "corporate" in Kansas, who responded to his subpoena for records. When he asked about videos, he was informed the hotel kept videos for 30 days, or possibly 24 hours. Myrick was arrested six months after the shooting.

¶ 26    Counsel also had invoices obtained from Myrick's girlfriend. The invoices did not list Myrick's name or social security number, but contained Myrick's company's name and his home address, and were dated September 21 and 24, 2012. Based on the invoices, counsel attempted to obtain a work order showing Myrick delivered phonebooks in Columbus but was unsuccessful.

Additionally, counsel was given no information regarding Anthony Coles. He did not subpoena hotel staff to testify.

¶ 27    The trial court denied Myrick's motion, finding counsel did not provide ineffective assistance. The judge merged the counts into one count of attempted first degree murder and sentenced Myrick to 46 years' imprisonment, which included a 25-year firearm enhancement. We affirmed on direct appeal. *Myrick*, 2020 IL App (1st) 170984-U (unpublished order under Illinois Supreme Court Rule 23). On December 21, 2020, Myrick filed a petition for leave to appeal this decision which the Illinois Supreme Court denied on March 24, 2021.

¶ 28    On January 15, 2019, Myrick filed a *pro se* postconviction petition under the Act, alleging ineffectiveness for trial counsel's failing to subpoena witnesses and investigate and corroborate his alibi. He claimed that the hotel bill showed he made payments October 3 - 10. Further, he claimed his work records reflected he had a contract to deliver equipment on October 3, and his transaction history showed that he got gas on October 3, using his Visa debit card. Myrick alleged counsel should have subpoenaed hotel staff and further corroborated his alibi defense.

¶ 29    Myrick alleged counsel failed to properly investigate his debit card transactions, which were "brought up in motion for trial counsel's file." Further, Myrick had provided counsel with the names of warehouse field supervisors whose signatures appeared on the tax invoices because "the company" reported they did not retain work records after three years. He asserted counsel should have contacted those individuals or subpoenaed documents to corroborate his trial testimony. Myrick acknowledged that counsel introduced hotel bills and a receipt from the hotel.

¶ 30    In support of his petition, Myrick attached bank statements from Chase Bank, showing transactions from September and October 2012. Relevant here, the Chase bank statements showed

a debit card transaction in Columbus on October 2, 2012, and three debit card transactions in Hammond, Indiana, on that same day, all by a debit card assigned to Myrick. Additionally, Myrick attached the hotel invoice from Value Place Hilliard, the articles of incorporation for QC Management Corporation showing Myrick was the registered agent, tax documents for QC Management Corporation, tax invoice sheets, and route recap sheets.

¶ 31 On February 28, 2019, the circuit court entered a written order dismissing Myrick's petition. The circuit court found Myrick failed to state the gist of a constitutional claim because he failed to show prejudice resulting from counsel's failure to investigate his bank statements. Specifically, the bank records showed a purchase in Ohio and another purchase in Hammond, Indiana, on October 2. The court noted that Myrick's petition did not mention he was in Hammond, a 50-minute drive from Chicago—information "more damaging to [Myrick's] alibi defense." Thus, the court concluded "[t]he choice not to put [Myrick] in the vicinity of the Chicagoland area on October 2, 2012, tends to benefit [Myrick]."

¶ 32 On February 8, 2019, Myrick filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure. The circuit court dismissed his petition on June 20, 2019. The appeal from that dismissal is currently pending in case number 1-20-057).

¶ 33                                        Analysis

¶ 34 On appeal, Myrick contends that the trial court erroneously dismissed his petition because he stated the gist of a claim of ineffective assistance of trial counsel for failure to investigate and corroborate his alibi defense.

¶ 35 The Act sets forth a three-stage process for criminal defendants to challenge their convictions based on constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008).

Myrick's petition for postconviction relief was summarily dismissed at the first stage. At the first stage, a defendant's petition survives summary dismissal if: "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17; *Tate*, 2012 IL 112214, ¶¶ 18-20. Defendant has the burden to satisfy both prongs. *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998). Where we can dispose of an ineffective assistance claim on the absence of prejudice, we need not address whether counsel's performance was objectively reasonable. *People v. Lacy,* 407 Ill. App. 3d 442, 457 (2011).

¶ 36    A petition may be summarily dismissed as "frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Hodges,* 234 Ill. 2d 1, 11-12 (2009); *People v. Tate,* 2012 IL 112214, ¶ 9. A claim has no arguable basis when based on an indisputably meritless legal theory, such as one completely contradicted by the record, or a fanciful factual allegation, such as those that are fantastic or delusional. *People v. Brown,* 236 Ill. 2d 175, 185 (2010). We review the summary dismissal of a postconviction petition *de novo*. *Hodges,* 234 Ill. 2d at 9.

¶ 37    On appeal, Myrick does not claim counsel was ineffective for failing to call alibi witnesses. Instead, Myrick argues counsel was arguably deficient for failing to discover and present his bank records which showed transactions made in Hammond and Columbus on the days before and the night of the shooting. He asserts prejudice because the case turned on credibility since no physical evidence tied him to the shooting, and the documents would have supported his testimony and undermined Kemps' unreliable identification.

¶ 38    Counsel has a professional duty to conduct "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v. Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland,* 466 U.S. at 691). This duty arises from "counsel's basic function 'to make the adversarial testing process work in the particular case.' " *Id.* (quoting *Strickland*, 466 U.S. at 690). This duty encompasses the obligation to independently investigate possible defenses. *Id.* (citing *People v. Kokoraleis,* 159 Ill. 2d 325, 329 (1994)) (finding duty to investigate possible defenses is "subset" of defense counsel's obligations)). When a defendant claims counsel failed to investigate, we judge that claim "against a standard of reasonableness given all of the circumstances, 'applying a heavy measure of deference to counsel's judgments.' " *Kokoraleis,* 159 Ill. 2d at 330 (quoting *Strickland,* 466 U.S. at 691). Failure to investigate constitutes ineffective assistance of counsel where the record demonstrates counsel had reason to know, from an objective standpoint, the availability of a possible defense. *Domagala*, 2013 IL 113688, ¶ 38.

¶ 39    As an initial matter, the State argues Myrick forfeited his ineffectiveness claim by failing to raise it on direct appeal. The State also argues that Myrick waived this claim by failing to include in his postconviction petition that appellate counsel was ineffective for failing to raise the claim on direct appeal. We disagree. "Issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited." *People v. Lenoir*, 2021 IL App (1st) 180269, ¶ 27. But, the Chase bank documentation attached to Myrick's postconviction petition was outside the record and therefore could not have formed the basis of an ineffective assistance claim on direct appeal. See *People v. Brown*, 2014 IL App (1st) 122549, ¶ 42

(where facts relating to postconviction claim do not appear in original appellate record, *res judicata* and waiver do not operate as bar to that claim).

¶ 40    Similarly, the State's argument that counsel's decision not to present Myrick's bank statements was strategic, and thus virtually unchallengeable, is unavailing. Arguments regarding counsel's trial strategy relate to second stage proceedings, where counsel represents both parties, "and where the petitioner's burden is to make a substantial showing of a constitutional violation." *Tate*, 2012 IL 112214, ¶ 22.

¶ 41    Turning to the merits, Myrick argues that, while counsel supported his alibi defense by presenting evidence of the hotel invoice, counsel was ineffective for failing to investigate further to support using his bank statements. We are unpersuaded. We find Myrick failed to demonstrate he was arguably prejudiced by counsel's failure to adequately corroborate his alibi with his bank statements because no reasonable probability exists that the outcome would have been different had they been introduced. *Lacy,* 407 Ill. App. 3d at 457 (noting that, if we can dispose of defendant's ineffective assistance of counsel claim because he or she suffered no prejudice, we need not address whether counsel's performance was objectively reasonable). While Myrick denied being in Chicago at the time of the shooting, the trial evidence overwhelmingly demonstrated guilt. The evidence showed Myrick at Johnson's house in Chicago with Russell, Sinai, and Kemp in the early morning hours on October 2.

¶ 42    At trial, Kemp and Myrick admitted they had known each other since elementary school. Johnson and Myrick admitted they knew each other because Johnson, a mechanic, had worked on Myrick's car. Kemp testified that he spoke with Russell, Sinai, and Myrick for over a half-hour on Johnson's porch that morning before Kemp went to a house across the street. Johnson testified

similarly—Myrick was at his house that morning, and Myrick, Russell, and Sinai were on his porch. Kemp and Johnson testified that Myrick, Russell, and Sinai had discussed delivering phone books. Kemp saw Myrick and the other men load phone books into Myrick's white van.

¶ 43    Once at the house across the street, Kemp saw Myrick in the front doorway, where Myrick accused Kemp of stealing from him before firing multiple shots in Kemp's direction. Kemp was shot 11 times. Kemp identified Myrick as the shooter. He had known Myrick since childhood. Johnson placed Myrick across the street from the scene of the shooting. He had known Myrick from working on his car. According to the paramedic that treated him, Kemp was lucid after the shooting, knew where he was, and answered questions appropriately.

¶ 44    By contrast, Myrick testified that he was working in Ohio and supported his testimony with the hotel invoice. But as the trial court pointed out, Myrick's bank statements show that he purportedly made purchases in Ohio and Hammond on the day of the shooting. Because the bank statements do not show the time he made the purchases, they would not have established Myrick's presence in Ohio. Further, counsel had already introduced the hotel invoice showing Myrick stayed at the hotel from September 12, 2012, through October 10, 2012. In addition, the jury heard testimony of witnesses who knew Myrick and identified him as the shooter or nearby at the time of the shooting.

¶ 45    We reject Myrick's claim that Kemp's identification of him was unreliable. Kemp testified that hospital staff informed him his memory *could* be affected by his surgeries; nevertheless, Kemp was lucid after the shooting and had known Myrick since elementary school. Moreover, Kemp's description of the shooter—5'8, 225 pounds, short hair, and a dark complexion—supports Myrick's description of himself at trial and the description by the officer who arrested and

processed Myrick. Kemp also knew where Myrick lived, confirmed by Myrick's testimony. Further, Johnson's testimony supported Kemp's that Myrick was at Johnson's home rather than in Ohio. Thus, ample corroborating evidence supports Kemp's identification of Myrick and undermines Myrick's alibi.

¶ 46    In light of the evidence against him, Myrick fails to show that he was arguably prejudiced by counsel's failure to corroborate his alibi defense with his bank statements. See *People v. Veach*, 2017 IL 120649, ¶ 30 (failure to satisfy either *Strickland* prong precludes finding of ineffective assistance of counsel).

¶ 47    Affirmed.